LENORE ELLISH, Appellant, *v.* AIRPORT PARKING COMPANY OF AMERICA, INC., Respondent.

Second Department, July 9, 1973.

*William S. Infeld* (*Leonard N. Shapiro* of counsel), for appellant.

*Robert Swaybill* for respondent.

HOPKINS, Acting P. J.   About to leave on a flight from John F. Kennedy International Airport on September 1, 1966, the plaintiff parked her automobile in a lot operated by the defendant under an agreement with the Port of New York Authority. When she returned on September 5, 1966, her automobile had disappeared.   Claiming that the defendant was responsible for the loss, she brought this suit.   The Civil Court granted judgment in her favor, finding that the transaction was a bailment (*Ellish* v. *Airport Parking Co. of Amer.*, 66 Misc 2d 470). The Appellate Term reversed and dismissed the complaint, finding that no bailment had been created (*Ellish* v. *Airport Parking Co. of Amer.*, 69 Misc 2d 837).   By permission of the Appellate Term the plaintiff appeals.

We affirm the order of Appellate Term.   Under the circumstances of this case we do not find the defendant liable for the plaintiff's loss.

The case was submitted to the Civil Court under an agreed statement of facts (CPLR 3222).   Briefly stated, the parties stipulated that the plaintiff drove into the parking lot at the airport, receiving from an automatic vending machine a ticket stamped with the date and time of entry.   On one side the ticket was labeled "License to Park" and stated that the lot provided self-service parking; it warned the holder that the lot was not attended and that the car should be locked.   On the other side the ticket contained the words in smaller print: "This contract licenses the holder to park one automobile in this area at holder's risk."   Further, it provided that the defendant was not responsible for the theft of the automobile.

Upon the plaintiff's receipt of the ticket, a gate opened, permitting the entry of the automobile into the lot.   The

plaintiff drove the automobile into a parking space, locked it and took the keys with her. Under the practice of the defendant, on leaving the lot, the holder of the ticket would drive to the point of exit, present the ticket to a cashier and pay the amount due based on the time elapsed. If the driver did not have a ticket, the cashier would demand proof of ownership of the automobile. The defendant employed personnel to maintain the lot and to check automobiles left overnight in order to make certain that the cashiers collected proper fees. The lot was patrolled by Port of New York Authority police, in the same manner as the airport.

Since the parties stipulated that neither had any knowledge concerning the disappearance of the automobile from the parking lot, the plaintiff could succeed in the action only by the existence of a duty on the part of the defendant to account for the loss of the automobile while standing in the lot. At common law when a chattel was placed by the owner in the possession of another under an agreement by the latter to deliver it on demand, a convenient short hand expression of a duty cast on the bailee was found by establishing a presumption of negligence if the bailee did not come forward with a satisfactory explanation to rebut the presumption (*Fidelity & Guar. Ins. Corp.* v. *Ballon,* 280 App. Div. 373; *Potomac Ins. Co.* v. *Donovan,* 274 App. Div. 666), though the burden of proof on the whole case remained on the owner (Richardson, Evidence [8th ed.], § 109). The rule thus reflected the judgment that the party last in possession of the chattel was better able to account for its loss.[1]

A bailment is, of course, merely a special kind of contract; it describes a result which in many instances does not flow from the conscious promises of the parties made in a bargaining process but from what the law regards as a fair approximation of their expectations (see 9 Williston, Contracts [3d ed.], § 1030, n. 7, p. 879; § 1033, pp. 884–885; § 1065, pp. 1011–1023). Hence, in formulating a rule to determine the extent of the liability of the defendant, we must concern ourselves with the realities of the transaction in which the parties engaged. The nature of the circumstances themselves leads to the determination whether the transaction should be considered a bailment, in which event the defendant is liable to the plain-

---

1. The presumption of negligence is similar to the doctrine of *res ipsa loquitur,* which an authority has said has been a strong factor in achieving verdicts in favor of plaintiffs (2 Harper & James, Law of Torts, § 19.11, p. 1099).

tiff, or whether the transaction should be considered a license to occupy space, in which event the defendant is not liable to the plaintiff.

Parking lots generally accommodate the free use of automobiles in urban areas. Automobiles are so much a part of urban life that it is necessary for both municipalities and private operators to make space available for parking. The parking lots scarcely resemble the traditional warehouses of the professional bailee with their stress on security and safekeeping. Rather, they are designed to meet the need of providing temporary space in crowded urban centers for a highly mobile means of transportation. In the case before us, the parking lot at the airport was designed to facilitate the passage of patrons of airlines by private automobiles to the point of their departure and arrival. As the use of air transportation is a major interest in our social and economic life, it is important that a fair rule, easy to apply, should govern the relationship of the parties to the transaction.

Against this general background we think these considerations are paramount:

1. The service provided by the defendant to the plaintiff was clearly a space for her automobile to stand while she was away on her trip. That space was located in a lot where many other automobiles were similarly standing and to which the operators of the automobiles and others were given access. The plaintiff was not treated differently from the other automobile operators; nor was she led to believe that the lot would not be open to others.

2. The service provided by the defendant was impersonal. The plaintiff was aware that the defendant had no employees either to deliver the ticket for the automobile or to park the automobile. She accepted the ticket from an automatic dispensing device and she parked the car herself, choosing her own space, not at the direction of the defendant.

3. The plaintiff retained as much control as possible over the automobile. She locked the car and kept the keys. She did not expect or desire the defendant to move the automobile in her absence.

4. The plaintiff followed the directions contained in the ticket she received. In her favor, we think that the plaintiff should not be closely bound by the terms of the ticket, for plainly it was a contract of adhesion. The plaintiff was hardly in a position to bargain over the conditions of the ticket and, indeed, the condition of nonliability for theft sought to be

imposed by the defendant is unenforceable under the public policy of our statute (General Obligations Law, § 5-325). Nevertheless, it is still the fact that the plaintiff heeded the warning of the ticket to lock her automobile.

5. We can draw the reasonable inference from the agreed statement of facts (CPLR 3222, subd. [b], par. 4) that, since the plaintiff followed the directions in the ticket, she read the other warnings which it contained to the effect that the lot was not attended and that the parking of her car was at her own risk. Thus, any expectation that the defendant would take special precautions to protect her car while she was away could not reasonably have been in her mind.

6. The actual operation of an airport parking lot must have been apparent to her. Thousands of automobiles were constantly entering and leaving the airport, many of which were using the parking lot that her car occupied. The plaintiff, seeing the confusion and bustle, should have realized the gigantic task which an individual check-out of each automobile would require — a task which she was aware the defendant did not undertake, since the ticket which she received did not identify her automobile.

In the absence of any proof of neglect by the defendant, then, we do not think that the defendant should be held responsible for the loss of the automobile. Other courts considering parking lots at airports have concluded as we do (*Wall v. Airport Parking Co. of Chicago*, 41 Ill. 2d 506; *St. Paul Fire & Mar. Ins. Co. v. Zurich Ins. Co.*, 250 So. 2d 451 [La. App.]; *Equity Mut. Ins. Co. v. Affiliated Parking*, 448 S. W. 2d 909 [Mo. App.]).[2]

We do not find *Dunham v. City of New York* (264 App. Div. 732), in which we allowed recovery for the loss of an automobile parked in a lot at the World's Fair held in 1939, a precedent requiring us to hold for the plaintiff here. In *Dunham*, though the motorist locked his car after parking it and retained the keys, an attendant gave a ticket to the motorist before parking and directed him to the space to be occupied, thereby giving the appearance of the acceptance of custody for the car. Here, instead, the defendant by its procedures of impersonal parking disclaimed any appearance of custody.

2. "Self-park" lots and garages have been said not to create a bailor-bailee relation (see *Weinberg v. Wayco Petroleum Co.*, 402 S. W. 2d 597 [Mo. App.]). In many cases the retention of the keys by the motorist is considered a decisive factor preventing liability for loss (see 9 Williston, Contracts [3d ed.], § 1065, pp. 1011-1023; 8 C. J. S., Bailments, § 1, subd. b, par. [2]; Ann. 7 ALR 3d 927).

We are of the opinion that liability should not be determined by ancient labels and characteristics not connected with present-day practices. It is one thing for the owner of a livery stable to have to explain the disappearance of a horse from its stall to the owner, but it is not at all the same for the operator of a parking lot at a busy airport to have to explain the disappearance from the lot of one of the thousands of cars parked there daily. Unless proof of negligence is present on the part of the operator of the lot, the risk of loss must be assumed by the owner of the automobile.

We therefore should affirm the order of the Appellate Term, without costs.

SHAPIRO, J. (dissenting). My learned brother, Mr. Justice HOPKINS, has aptly stated the question here to be determined when he says: "The nature of the circumstances themselves leads to the determination whether the transaction should be considered a bailment, in which event the defendant is liable to the plaintiff, or whether the transaction should be considered a license to occupy space, in which event the defendant is not liable to the plaintiff." He concludes that "the realities of the transaction in which the parties engaged" establish that when the plaintiff placed her automobile in the defendant's enclosed parking lot (from which she was not free to remove it without paying the accrued parking charges) she merely obtained "a license to occupy space". I cannot subscribe to that view.

We start with the undisputed fact that the plaintiff was a captive-customer of the defendant. There was no public street on which she could park her car; nor did she have a choice of parking facilities. If she was to come to the airport by automobile — which she had a right to do and the doing of which was encouraged by the defendant's operation of a commercial parking lot there — she had no choice of accommodations. She could not pick out a parking lot in which the operator would take her keys and park her car. It was the defendant's lot or none at all. Under such circumstances and considering the fact that the plaintiff was not free to leave with her automobile until she had first paid the charges due thereon, it seems to me that "the realities of the transaction in which the parties engaged" clearly show a sufficient retention of control by the defendant over the plaintiff's car to make the defendant liable for the loss in the absence of the defendant's giving any explanation for the loss.

180

Although the majority recognizes that " the condition of non-liability for theft sought to be imposed by the defendant [by virtue of the terms of the ticket-receipt which the plaintiff received from the automatic machine] is unenforceable under the public policy of our statute (General Obligations Law, § 5–325)," it nevertheless draws the inferences, improperly I believe, " that the plaintiff heeded the warning of the ticket to lock her automobile " and that, since the plaintiff followed that direction on the ticket, she must have " read the other warnings which it contained to the effect that the lot was not attended and that the parking of her car was at her own risk " and that therefore " any expectation that the defendant would take special precautions to protect her car while she was away could not reasonably have been in her mind." But those successive assumptions, heaped upon one another, proceed on the theory that the plaintiff, and others like her, approached this parking lot with *tabula rasa*—that she knew what to do only from reading the instructions on the ticket. That assumption, in my opinion, lacks validity. Every driver these days is familiar with parking lot procedures and does not have to examine a ticket (with printing usually too small to be readily readable) to know what to do when he enters a self-service parking lot. Every driver knows that airport parking lots are fenced in and attended at all times because he knows that he must pay the full parking fee due when he comes to retrieve his car. The lot operator's retention of the right to payment when the car owner comes for his car, it seems to me, carries with it a concomitant representation that the car will be there at that time, since, at least to that extent, the parking lot operator has retained control over the car. Such awareness by a patron of his obligation to pay when he returns for his car is inconsistent with any implication of acceptance by him of the risk of an unexplained disappearance of the car from the lot.

Neither do we believe that the plaintiff's observations of the confusion and bustle which unfortunately characterize the operations of our huge airports at heavy-use periods should have led her to realize that the parking lot operator owed her no duty of seeking to ascertain that the check she had received when entering the parking lot with her car was the same check presented by the person leaving the lot with her car. Would not the patron have reason to believe, from the fact that the lot was fenced in and its exit gate manned throughout the day and night, that his car was safer there than on the streets or in an unmanned, unpatrolled and unfenced lot and that the lot oper-

ator was accepting supervision and control, though limited in degree, of his car?

To buttress its conclusion that the defendant should not " be held responsible for the loss of the automobile ", the majority says that other courts considering parking lots at airports have concluded as the majority does (*Wall* v. *Airport Parking Co. of Chicago*, 41 Ill. 2d 506; *St. Paul Fire & Mar. Ins. Co.* v. *Zurich Ins. Co.*, 250 So. 2d 451 [La. App.]; *Equity Mut. Ins. Co.* v. *Affiliated Parking*, 448 S. W. 2d 909 [Mo. App.]). However, these three cases are not at all persuasive. All three use as their keystone the outworn limitation of the law of bailment. *Wall* v. *Airport Parking Co. of Chicago* (*supra*) follows the reasoning of *Greene Steel & Wire Co.* v. *Meyers Bros. Operations* (44 Misc 2d 646 [App. Term, 1st Dept.]) although the *Greene* case did not deal with the loss of an automobile, but with damage to it.* In the *St. Paul* case the court based its decision on the ground that in Louisiana the self-service long-term airport parking lot from which the car was stolen was an exception to the general rule that parking lots are treated as compensated depositories against which negligence need not be proved in cases of vehicle loss or theft, because its operation was so " restricted and structured so as to make it *clear* that the patron-motorist merely leases parking space rather than making a deposit of his car " (p. 453). In the *Equity Mutual* case the rejection of the plaintiff's claim was based on the erroneous premise that it could recover only if there was " such delivery to the bailee as would entitle him to exclude the possession of anyone else, even the owner, for the period of the bailment " (p. 914).

---

* There are a number of appellate decisions dealing with the problem of the liability of parking lot operators for loss of cars left with them (*Galowitz* v. *Magner*, 208 App. Div. 6; *Chamberlain* v. *Station Parking Serv.*, 251 App. Div. 825; *Dunham* v. *City of New York*, 264 App. Div. 732; *Greene Steel & Wire Co.* v. *Meyers Bros. Operations*, 44 Misc 2d 646 [App. Term, 1st Dept.]). The only one which is directly in point is our decision in *Dunham*, which the majority attempts to distinguish on the factual ground that in *Dunham*, though the motorist locked his car after parking it and retained the keys, his ticket-receipt was given to him on entrance by an attendant instead of by a machine and the attendant directed the motorist to the space to be occupied. But this difference in no way lessens the essential impersonal nature of the procedure used by the parking lot operator in allocating space for the car; nor does it do away with the fact that the motorist, by locking the car and keeping the keys, retains exactly the same form of partial control of his car as if he himself chose the vacant spot in which to leave his car and received his ticket-receipt from a ticket-dispensing machine. Thus, if anything, *Dunham*, which is the only appellate case dealing with the theft of an automobile from an airport parking lot, squarely supports the appellant's position.

Parking lots where the operators retained dominion over any cars parked in the lots until the cars were returned to their owners have traditionally been held to be liable for loss or damage unless the owners rebutted the presumption of negligence by showing reasonable care. Modern technology has allowed parking lot operators at airports to dispense with attendants at the entrances of the lots who insured that the license numbers and makes of the cars were recorded on the receipts so as to help insure that the holders of the receipts were in fact the owners of the cars when they were taken out of the lots. This cutting of costs of operation, while retaining sufficient dominion of the cars parked in their lots by means of fencing and manned exit gates to insure payment of the fees due as a condition of releasing parked cars to their owners, has caused the operators to seek to avoid liability for loss or damage by claiming that their more automatic method of operation eliminates the presumption of negligence in case of loss they formerly had to rebut. In our view, the shift to lessened personal contact between the lot operator's employees and his patrons in no way changes the basic nature of the relationship between the lot operator and his patrons so long as he retains dominion over the cars parked in his lot and can withhold their return until he is paid the full fee due for the parking. It would be ironic if the operator's use of additional cost-saving devices were read as lessening his responsibility to use due care in protecting cars parked with him from damage or theft. If he fences in the lot, mans its exits at all hours so that his employees control every removal of cars from the lot, and patrols the lot nightly to record all cars left overnight, he is clearly responsible to exercise a reasonable effort to use his facilities to prevent or at least minimize theft of cars from the lot. And if a theft does occur he must rebut the presumption of negligence that arises therefrom by showing that he used reasonable care to avoid thefts.

Airport long-term parking lots are not public streets or open parking areas. Patrons who must use such lots are made aware of this by the fact that the lots are fenced in and their exits are guarded at all times. Such patrons expect the use of due care by the operator to prevent removal of their cars without the receipts given them by the lot operator (by a machine), the more so because they have no choice but to use the lot and pay the fee imposed. If they find their cars gone when they return, they should be able to recover for the loss unless the operator can show that the loss occurred despite his exercise of due care.

Such a result is in accord with both public policy and with the public interest in facilitating air travel.

For the foregoing reasons the order of the Appellate Term should be reversed and the judgment of the Civil Court in favor of the plaintiff should be reinstated.

CHRIST and BENJAMIN, JJ., concur with HOPKINS, Acting P. J.; SHAPIRO, J., dissents and votes to reverse and to reinstate the judgment of the Civil Court of the City of New York, Queens County, with an opinion, in which LATHAM, J., concurs.

Order of the Appellate Term of the Supreme Court, Second and Eleventh Judicial Districts, entered May 11, 1972, affirmed, without costs.