**PARKING MANAGEMENT, INC.,**
Appellant,

v.

**Mark GILDER, Appellee.**

**No. 7581.**

District of Columbia Court of Appeals.

Argued en banc March 20, 1975.

Decided July 31, 1975.

---

**52**

Herman Miller, Washington, D.C., for appellant.

Edward L. Genn, Washington, D.C., for appellee.

Before REILLY, Chief Judge, and KELLY, FICKLING, KERN, GALLAGHER, NEBEKER, YEAGLEY and HARRIS, Associate Judges."

GALLAGHER, Associate Judge:

This court decided to hear this case *en banc* after a divided division of the court had reversed a judgment awarding appellee damages after a nonjury trial. *Parking Management, Inc. v. Gilder,* D.C.App., 327 A.2d 323 (1974), *vacated* by order of the court, December 19, 1974.

Appellee parked his car at the Parking Management, Inc. parking area which is enclosed within the Washington Hilton Hotel in this city. He was directed to a space by an attendant. He locked his car and kept the keys. He then opened the trunk in plain view of a group of employees[1] and placed his lady friend's cosmetic bag in it and then locked the trunk. The rear of the car was exposed to the aisle. Upon his return, he found the trunk lid damaged from being pried open and reported it to the management.

The principal question for the court, initially at least, is the nature of the legal relationship of the parties. More particularly, it must be determined at the outset whether the parking lot operator owed the car owner any duties and, if so, what they were. In order to resolve this, it is necessary to examine the nature of the parking operation. It is not enough simply to ascertain whether the car owner locked his car and kept the keys ("park and lock"). These are material factors to be considered, but they do not end the inquiry.

1. The attendants were standing ten to fifteen feet away.

When the car owner entered, he was handed a ticket by one of three attendants and directed to a particular parking space. There were about 160 lined spaces on one level and about 150 lined spaces on a second level. These were self-service to the extent that the driver places the car in a space at the direction of an attendant. If additional spaces are needed, *the aisle spaces are utilized* and according to the parking operator (PMI) these are "not self-service," which may only be construed as meaning that the attendants park the cars in the aisles and retain the keys. There is thus a mixed arrangement here, one being self-service and the other non-self-service, depending upon the volume of customers. Under appellant's theory of the case, there would be the anomaly of a bailment for the cars parked in the aisle[2] but not for those in the lined spaces on the same floor in the same garage.

When appellee entered the garage, a number of PMI employees were on duty including a manager, a cashier, and three attendants. According to the Supervisor of Plans and Operations for Parking Management, Inc. (PMI):

A PMI employee is a uniformed employee. He is a public relations man for our company. He is a service man for our company. . . . He is there to control the parking, guide the parking *and control whatever is necessary in respect to housekeeping and any general operations that might pertain to the parking industry.* (Emphasis added.)

In respect to thefts at the garage the Supervisor said there were some claims for thefts, but those were more than fifteen days before this incident. He said that thefts are "not necessarily a big problem, but, of course, damages and thefts, *security is a major concern*" (emphasis added).

He also agreed that watching the area and acting as a "kind of security" is part of the employees' job.

The trial court in this nonjury case concluded that the evidence established either (a) a bailment or (b) that the protection which the patron was led to believe existed was not provided. The court thereupon entered judgment for the car owner.

Appellant contends this was error since appellee parked his car in the parking enclosure and retained the car keys, and consequently a bailor-bailee relationship did not exist, citing *Quinn v. Milner,* D.C. Mun.App., 34 A.2d 259 (1943), and subsequent decisions of this court.[3] Appellant does not address itself to the alternative finding of the court concerning the lack of protection which the car owner was led to believe existed.

Appellant is correct in its assertion that this court has stated in those cases that a bailment did not exist where the car owner (a) parked his car and (b) kept the car keys (*but see 1420 Park Roard Parking, Inc. v. Consolidated Mutual Insurance Co.,* D.C.Mun.App., 168 A.2d 900, 901–02 (1961) (Hood, J., dissenting)). However, those cases simply involved those two factors and nothing more. Here there was additional evidence on the parking arrangement involved, *e. g.,* the presence of 5 employees to service the customers in an enclosed area of the hotel and the acknowledgment that security of the cars is a major concern of PMI, which, according to the PMI supervisor, includes watching for thefts and tampering with the vehicles, as well as the acknowledged exertion of "control . . . in respect to housekeeping and any general operations that might pertain to the parking industry." Although, strictly speaking, the finding that a bailment existed may be open to debate, we believe the

---

2. *See, e. g., Quinn v. Milner,* D.C.Mun.App., 34 A.2d 259 (1943).

3. *E. g., McClellan v. Allstate Insurance Co.,* D.C.App., 247 A.2d 58 (1968), and *1420 Park*

*Road Parking, Inc. v. Consolidated Mutual Insurance Co.,* D.C.Mun.App., 168 A.2d 900 (1961).

trial court reached the correct result [4] in any event by way of its alternative finding that the protection the car owner was entitled to believe existed was not provided.

The car owner was entitled under the circumstances to expect that reasonable care would be utilized to prevent tampering with his auto; and that this was not an unreasonable expectation on his part was demonstrated by testimony of the management of PMI to the effect that this was in fact among the duties of the employees. The evidence here permitted the court to find there was a lack of protection which the car owner was entitled to believe existed. This being so, we must accept this finding as it is not clearly erroneous. D. C.Code 1973, § 17–305(a).

While there has been a tendency to consider a showing of a "park and lock" arrangement as creating a lease agreement [5], we doubt the sophistication of this doctrine.[6] Unlike the usual tenant of realty, the car owner has utterly no control of the so-called leased space as he is by definition always absent and helpless to protect his property, for all practical purposes. There is in most instances no fixed term, the duration of the parking being usually at the option of the car owner. Lastly, the car owner may not remove the car until the parking fee is paid.

The owner of the car cannot observe and protect the car since he is always absent from it. It is the operator, not the car owner, who is in a position to have the superior knowledge.

We do not consider the law of landlord-tenant to be an apt doctrine to apply in such cases; and we think the time has come to reject that outmoded theory with its unrealistic confines in this type of application.[7] Nor do we think mechanical labels should be applied to the relationship in "park and lock" arrangements.[8]

While we held in *Sarbov Parking Corp., v. Motors Insurance Corp.*, D.C.App., 255 A.2d 112 (1969), that since the lot operator had actual notice of the mischief but took no steps to prevent it, the "park and lock" lot operator was liable, this is not to say that absent such actual notice a lot operator necessarily escapes liability. Our decision there was confined to the particular facts of that case, though we did in fact state the reality that "park and lock" was *generally* "thought to create either a lease or license relationship." *Id.* at 113.[9]

On the facts here presented, we believe an operator may be required to exercise reasonable care to avoid malicious mischief to, or theft of, vehicles parked on a commercial parking lot [10] (a going con-

---

4. "In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937).

5. *E. g., Quinn v. Milner, supra.*

6. In the matter of the liability of parking lot owners in "park and lock" cases, there appears to be emerging a different school of thought, *e. g., Sparrow v. Airport Parking Company of America*, 221 Pa.Super. 32, 289 A.2d 87 (1972), and *see Ellish v. Airport Parking Co. of America, Inc.*, 42 A.D.2d 174, 181, 345 N.Y.S.2d 650, 657 (1973) (Shapiro, J., dissenting), where, in referring to parking lot liability, the dissenter refers

to "the outworn limitation of the law of bailment".

7. The lot owner is assuredly entitled to operate his lot in the most economical way. But this is not to say that in so doing he may necessarily expect to shed his duty of care.

8. We exclude from this discussion damage resulting from the sole negligence of other car owners on the lot (or in a garage).

9. In any event, to the exent that prior decisions of the court appear to be in conflict this decision governs.

10. Cars parked massively at airports, for example, perhaps at a comparatively reduced rate, may present a different situation, based upon what a car owner may reasonably expect

cern), even though the arrangement was "park and lock." The car owner was necessarily absent when the car damage occurred and should not be disadvantaged as a matter of law because of this reality. We do not feel that a car owner may fairly be regarded as a virtual stranger to the lot operator except for the payment of a parking fee.

This view is founded upon the principle that "[w]here a contract is implied from the surrounding circumstances, the law will derive its terms from the circumstances shown." *Sparrow v. Airport Parking Company of America*, 221 Pa.Super. 32, 289 A.2d 87, 92 (1972). "There are . . . situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct . . . . Normally such a duty arises out of a contract between the parties, in which such protection is an express or implied term of the agreement." Restatement (Second) of Torts § 302B, comment (e) (1965).

■ The circumstances here were sufficient to create an implied duty of reasonable care by the lot operator to protect the car from malicious mischief, and we conclude the finding by the trial court that a violation of that duty occurred was not clearly erroneous.[11] Consequently, the judgment is

*Affirmed.*

under the individual circumstances. A different view likewise may, upon consideration, be applied where there is paid parking to witness a specific event, *i. e.*, where the parking arrangement is on an *ad hoc* basis only. The legal relationship depends upon the

place, the conditions and the nature of the transaction.

11. *Springer v. Springer*, D.C.App., 248 A.2d 822 (1969).