**Gerda Dorothea DeWEERTH, Plaintiff,**

v.

**Edith Marks BALDINGER, Defendant and Third-Party Plaintiff,**

v.

**WILDENSTEIN & CO., INC., Third-Party Defendant.**

No. 83 Civ. 1233 (VLB).

United States District Court, S.D. New York.

April 20, 1987.

---

Fox Glynn & Melamed, New York City, for plaintiff; John R. Horan, Jeffrey P. Wiegand, of counsel.

Edward M. Sills, New York City, for defendant and third-party plaintiff.

Shearman & Sterling, New York City, for third-party defendant; Jeremy G. Epstein, of counsel.

VINCENT L. BRODERICK, District Judge.

I.

Plaintiff Gerda Dorothea DeWeerth seeks the return from defendant Edith Marks Baldinger of a painting by Claude Monet entitled "Champs de Blé à Vetheuil" ("the Monet").

A bench trial was had before me on a "submitted" basis, in which written and videotaped depositions and the exhibits were made available to me. This opinion contains my findings of fact and conclusions of law.[1]

II.

The court has jurisdiction of the action under 28 U.S.C. § 1332(a)(2); Mrs. DeWeerth is a citizen of the Federal Republic of Germany, and Mrs. Baldinger is a citizen of the State of New York. The Monet which is the subject of this action is worth more than $10,000.

Venue is proper under 28 U.S.C. § 1391(a).

The Monet is an impressionistic depiction in oil of a wheat field, a village and trees near Vetheuil, France. It measures 65 centimeters by 81 centimeters, and is signed and dated "Claude Monet '79".

Mrs. DeWeerth's father, Karl von der Heydt, purchased the Monet in or about 1908, and he thereafter kept it in his house in Bad Godesberg, West Germany. Plaintiff inherited the Monet from her father after his death on August 9, 1922, in the division of the works and objects of art in his estate. With the exception of the years 1927 to 1929, when the Monet was kept in her mother's house, plaintiff kept the Monet in her residence in Wuppertal-Elberfeld from 1922 until August 1943, where it was on display on a wall next to a sculpture by Auguste Rodin, also inherited from her father. This sculpture is still in plaintiff's possession at her West German residence, and plaintiff has submitted a 1943 photograph showing the Monet and the Rodin displayed together in her residence. From that time until the present, she neither sold nor otherwise disposed of the Monet, nor did she entrust the Monet to anyone else to sell or otherwise dispose of it.

In August 1943, during the Second World War (the "War"), Mrs. DeWeerth sent the Monet, along with the Rodin sculpture and other valuables, by van to her sister Gisela von Palm (now deceased) in Oberbalzheim in Southern Germany, for safekeeping. Although the van arrived, plaintiff never saw the Monet again. In the fall of 1945, Gisela von Palm informed plaintiff of the disappearance of the Monet from Mrs. von Palm's house in Oberbalzheim. There is no direct evidence as to what caused the disappearance of the Monet. American soldiers were quartered in the house after the close of the War in 1945, and it was after they had left that its disappearance was noted. I infer that either one of those soldiers, or someone else, stole the painting from the von Palm house where it had been sent for safekeeping.[2]

---

1. Mrs. Baldinger has brought a third-party action against Wildenstein & Co., Inc., a New York art dealer, from whom she bought the Monet in 1957. The pre-trial order provided for separate trials of Mrs. DeWeerth's claim against Mrs. Baldinger and Mrs. Baldinger's claim against Wildenstein. This opinion only addresses the primary action.

2. This inference is supported by, *inter alia,* the testimony of Frau Huber, who worked for Mrs. von Palm at the time of the painting's disappear-

Mrs. DeWeerth was approximately 50 years old when she learned of the Monet's disappearance. Subsequently, she made efforts to locate it. In 1946 she reported the loss of the Monet to the military government then administering the Bonn-Cologne area after the end of the War. In 1948 she solicited the assistance of her lawyer, Dr. Heinz Frowein, in attempting to find and recover it. Plaintiff also made inquiries in 1955 of one Dr. Alfred Stange, known to Mrs. DeWeerth as an art expert. In 1957 she reported the Monet as missing to the *Bundeskriminalamt* (the West German federal bureau of investigation) in Bonn. All of these efforts to find the Monet were unsuccessful.

By December 1956 however, the Monet had found its way to the United States through Switzerland. Third party defendant Wildenstein & Co., Inc. ("Wildenstein"), an art gallery in New York City, appears to have acquired the Monet on consignment from Francois Reichenbach, an art dealer from Geneva, Switzerland, in about December 1956. From December 1956 to June 1957, Wildenstein had possession of the Monet in New York. A Wildenstein record shows a 1962 payment, or credit, to Reichenbach, evidently for the Monet.

In June 1957, Wildenstein delivered the Monet for inspection to Mrs. Baldinger at her residence at 710 Park Avenue, New York, New York. Mrs. Baldinger, after several days, purchased the Monet in good faith and for value from Wildenstein on or about June 17, 1957.

After its purchase by Mrs. Baldinger, the Monet was publicly exhibited only on two occasions. Mrs. Baldinger exhibited the Monet at a benefit held in the Waldorf-Astoria Hotel in New York City, from October 29 to November 1, 1957, and loaned it to Wildenstein for display during a Wildenstein exhibition entitled "One Hundred Years of Impressionism" held April 2 to May 9, 1970 at its gallery in New York City. At the close of this exhibition, Wil-

denstein returned the Monet to Mrs. Baldinger. Except for those two exhibitions, Mrs. Baldinger maintained the Monet exclusively in her residence at 710 Park Avenue, New York City, from June 1957 to the present date.

There are only four published references to the Monet in the art literature: two of them are in catalogues in connection with the exhibitions already cited, and the other two are in publications with which Wildenstein was apparently connected:

(1) *Claude Monet: Bibliographie et Catalogue Raisonne, Vol. 1 1840–1881.* Published by la Bibliotheque des Arts, Lausanne, Paris; introduction by Daniel Wildenstein; collaborators Rodelphe Walter, Sylvie Crussard, and the Foundation Wildenstein, 1974, Geneva; painting no. 595.

(2) The exhibition catalogue *One Hundred Years of Impressionism, A Tribute to Durand-Ruel, A Loan Exhibition,* April 2–May 9, 1970, Wildenstein Gallery, New York; painting no. 43.

(3) *Monet: Impressions,* Daniel Wildenstein, published in New York, 1967, Library of Congress call no. ND553.-M76W5313.

(4) The exhibition catalogue *Festival of Art,* October 29–November 1, 1957, Waldorf-Astoria Hotel, New York; item 125.

In or soon after July 1981, plaintiff, through the efforts of her nephew Peter von der Heydt, discovered that the Monet had been exhibited in 1970 at the aforementioned Wildenstein loan exhibition. Plaintiff thereafter retained counsel in New York in 1982 to determine whether Wildenstein knew the identity of the present possessor of the Monet. When Wildenstein refused to disclose the possessor's identity or the Monet's whereabouts, plaintiff commenced a proceeding in November, 1982 against Wildenstein in New York State Supreme Court seeking "disclosure to aid in bringing an action" under N.Y.C.P.L.R.

---

ance, and who testified that Mrs. Palm was very upset when she discovered that the painting was missing. Evidence admissible under the excited utterance or res gestae exception to the hearsay rule can be used to prove the happening of a

startling event. *Insurance Co. v. Mosley,* 75 U.S. (8 Wall.) 397, 19 L.Ed. 437 (1869); *Stewart v. Baltimore & O. R. Co.,* 137 F.2d 527, 529–30 (2d Cir.1943); *see* 4 Weinstein's Evidence ¶ 803(2) [01] at 803–88 (1985).

§ 3102(c). On December 1, 1982, the State Supreme Court found for the plaintiff, ordering Wildenstein to reveal the identity of the possessor. Plaintiff thereafter learned that defendant Baldinger possessed the Monet.

By letter to Baldinger dated December 27, 1982, plaintiff demanded return of the Monet. By letter dated February 1, 1983, Baldinger refused the demand. This action ensued.

### III.

Under *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), in this diversity action I must apply the same substantive law that New York would apply, including New York's choice of law rules. Thus the initial question is whether, under New York choice of law theory, German or New York law is applicable to determine who owns the Monet.

In resolving this issue, I am guided by *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F.Supp. 829, 845 (E.D.N.Y.1981), *aff'd.*, 678 F.2d 1150, 1160 (2d Cir.1982) ("*Elicofon*"), a case upon which both parties rely. In *Elicofon*, a diversity action brought by a German government art museum seeking recovery of two stolen paintings, involving both East and West Germany, a foreign national, and an American citizen, the court was required to determine the ownership of two Albrecht Duerer portraits executed around 1499. These portraits had been stolen in 1945 from a castle in what is now East Germany and discovered in 1966 at the New York residence of Elicofon, an American citizen, who alleged that he had purchased them in good faith 20 years earlier from an American ex-serviceman who appeared at his Brooklyn home and represented that he had bought them while in Germany. On cross-motions for summary judgment, the district court held for the German government art museum and against Elicofon, finding that the art museum had sufficient ownership interest in the paintings to pursue the action. In doing so, the district court ruled that German law [3] was not applicable to determine whether Elicofon acquired title to the paintings. It found that "New York's choice of law dictates that questions relating to the validity of a transfer of personal property are governed by the law of the state where the property is located at the time of the alleged transfer." 536 F.Supp. at 846 (*citations omitted*). Moreover, it noted that the same result would obtain if it applied the "significant relationship" analysis often invoked by New York courts to the facts of the case, that is, if it determined which state had the most significant relationship to the chattel and to the parties. *Id.*

Applying either analysis dictated the same result in *Elicofon:* New York law applied. The court ruled that "Germany's connection with the controversy [was] not sufficient to justify displacing the rule of *lex loci delictus.*" *Id. citing Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 71, 286 N.E.2d 454, 461 (Ct.App.1972). It found the fact that the theft of the paintings occurred in Germany was "totally irrelevant to the policy of [German law] to protect bona fide purchasers so as to promote the security of transactions." *Id.* Instead, it found significant contacts with New York:

> In contrast, the contacts of the case with New York, i.e., Elicofon purchased and holds the paintings here, are indeed relevant to effecting its interest in regulating the transfer of title in personal property in a manner which best promotes its policy. The fact that the theft of the paintings did not occur in New York is of no relevance. In applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with the question of where the theft took place, but

**3.** Specifically, Elicofon asserted acquisition of title under the German law doctrine of *Ersitzung*, under which "title to movable property may be obtained by a good faith acquisition of the property plus possession of it in good faith, and without notice of a defect in title, for the statutory period of ten years from the time the rightful owner loses possession." *See Elicofon*, 536 F.Supp. at 845.

simply whether one took place. Similarly, the residence of the true owner is not significant for the New York policy is not to protect resident owners, but to protect owners generally as a means to preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods. In finding that New York law governs the question of title, we hold that Elicofon did not acquire title under [German law].

*Id.* at 846.[4]

Under *Elicofon,* I find that the law of New York governs all issues in this case, including the question of which party has the superior right to possession of the Monet. New York is the place where the sale of the painting to Mrs. Baldinger occurred and where the Monet is and has been located. The fact, as in *Elicofon,* that the theft of the Monet took place in Germany and not New York is irrelevant, as is the fact that Mrs. DeWeerth is a resident of Germany and inherited the painting while in Germany. New York policy, as described in *Elicofon,* is to protect owners generally

"as a means to preserve the integrity of transactions and prevent the state from becoming a market place for stolen goods." This policy warrants the application of New York law in the case before me.[5]

## IV.

Having determined that New York law applies, I turn to the merits of the case. Defendant has argued initially that plaintiff's action should be barred both by the defense of laches [6] and the statute of limitations governing actions for recovery of a chattel due to her long delay in asserting her claim, and also because she has not diligently sought to discover the painting's whereabouts until now.[7]

It is not disputed that Mrs. Baldinger acquired the Monet in 1957; that Mrs. DeWeerth upon discovering in December, 1982 that defendant had the painting, demanded return of the Monet on December 27, 1982 and that defendant refused the demand on February 1, 1983; and that on February 16, 1983 plaintiff instituted this

---

4. The Second Circuit affirmed the district court's choice of law rulings, "substantially for the reasons stated in the district court's opinion." 678 F.2d at 1160.

5. It is true that the court in *Elicofon* considered German law governing the question of succession. However, to the extent that German law should apply to the issue of plaintiff's inheritance of the Monet, neither party has demonstrated that German law differs from New York law, and I have not embarked on an independent investigation of the question. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank N.A.,* 731 F.2d 112, 121 (2d Cir.1984) *citing Cousins v. Instrument Flyers, Inc.,* 44 N.Y.2d 698, 405 N.Y.S.2d 441, 376 N.E.2d 914 (Ct.App.1978); *Bartsch v. Metro-Goldwyn-Mayer, Inc.,* 391 F.2d 150, 155 n. 3 (2d Cir.1968), *cert. den.* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968). Moreover, the issue is in essence whether the evidence of plaintiff's possession of the Monet is sufficient under New York law to entitle her to possession. In any event, I have found as a matter of fact that plaintiff inherited the Monet from her father and the issue of whether German law applies is irrelevant.

6. The defense of laches is composed of four elements which must be established by the defendant:

(1) conduct on the part of the defendant ... for which the complainant seeks a remedy;

(2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit;

(3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and

(4) injury or prejudice to the defendant in the event that relief is accorded to the complainant or that the suit is not held to be barred. *Dedvukaj v. Madonado,* 115 Misc.2d 211, 214, 453 N.Y.S.2d 965, 968 (N.Y. City Civ.Ct.1982) *citing* 36 N.Y.Jur., Limitations & Laches, Sec. 153 at 141 (1964).

7. Among the affirmative defenses asserted by defendant are laches, statute of limitations, failure to exercise due diligence in pursuit of a claim, waiver, and estoppel. Because all of these defenses raise essentially the same issue—whether plaintiff's claim to recover the Monet was timely and not unreasonably delayed—I treat all of these defenses together in this section. Defendant herself concedes this point, at least with respect to the overlap between laches and statute of limitations. *See* Joint Trial Brief of Defendant and Third-Party Defendant at 11* *citing Bohemian Brethren Presbyterian Church v. Greek Archdiocesan Cathedral of the Holy Trinity,* 94 Misc.2d 841, 405 N.Y.S.2d 926, 929 (Sup. Ct.N.Y.Co.1978), *aff'd.,* 70 A.D.2d 538, 416 N.Y. S.2d 751 (1st Dept.1979); *Elicofon,* 536 F.Supp. at 852 n. 20.

action. Mrs. Baldinger asserts that plaintiff's claim is barred by the three year statute of limitations contained in N.Y.C.P.L.R. § 214(3).[8]

■ Under N.Y.C.P.L.R. § 214(3) the three year statute of limitations does not commence running until a demand is made to return the property and the demand is refused. *See Elicofon,* 536 F.Supp. at 848 citing *Frigi-Griffin Inc. v. Leeds,* 52 A.D.2d 805, 383 N.Y.S.2d 339 (1st Dept. 1976), *aff'd.,* 678 F.2d at 1161.[9] Thus when Mrs. DeWeerth instituted her suit in 1983, it was well within three years of accrual of the cause of action and timely under New York law.

It is also true as a matter of New York law that "a party may not unreasonably delay in making a demand which starts the running of the limitations period." *Elicofon,* 536 F.Supp. at 849 citing *Heide v. Glidden Buick Corp.,* 188 Misc. 198, 67 N.Y.S.2d 905 (1st Dept.1947). "The question of what constitutes a reasonable time to make a demand depends upon the circumstances of the case." *Elicofon,* 536 F.Supp. at 849 citing *Reid v. Board of Supervisors,* 128 N.Y. 364, 28 N.E. 367 (1891); *Nyhus v. Travel Management Corp.,* 466 F.2d 440 (D.C.Cir.1972). Mrs. Baldinger claims that Mrs. DeWeerth did little to locate the Monet and nothing to publicize her loss, and what steps she did take to locate the painting were inadequate. Therefore, Mrs. Baldinger argues that Mrs. DeWeerth's claim is barred by virtue of her lack of diligence in locating and claiming the painting as her own, and by virtue of the unreasonableness of the delay in commencing her suit.

Defendant cites *Elicofon* for the proposition that an initial demand must be made within a reasonable time and that plaintiff has a duty to make genuine and diligent efforts to ascertain who had the painting so as to be able to make her demand. In *Elicofon,* defendant claimed that it was plaintiff's duty to make "genuine and diligent efforts to find the paintings" and because plaintiff failed to make such efforts "any delay in making a demand for the paintings was unreasonable." 536 F.Supp. at 849. Plaintiff in *Elicofon* rejected the contention that it had a duty to look diligently for the paintings, and suggested that "its only duty was to make the demand once it knew of the location of the paintings." *Id.* The court in *Elicofon* did not decide the issue because "the undisputed evidence clearly demonstrate[d] that the [plaintiff] made a diligent although fruitless effort to locate the paintings." *Id.* at 849–50.

The same is true in this case.

■ After she learned from her sister that the Monet was missing, Mrs. DeWeerth set out on a course to locate and recover it. I have already found that (1) in 1946, she reported its loss to the military government then administering the Bonn-Cologne area after the end of the War; (2) in 1948, she solicited the assistance of her lawyer in endeavoring to find it; (3) in 1955, she made inquiries to an art expert she knew of; and (4) in 1957, she reported it as missing to the *Bundeskriminalamt.* Thus plaintiff made a "diligent although fruitless effort" to find the Monet through 1957. I am further persuaded that upon the circumstances of this case the plaintiff's failure to pursue the Monet after 1957 until her nephew discovered in 1981 that the Monet had been exhibited in New York was reasonable. Mrs. DeWeerth was an elderly woman during that period, and the only published references to the Monet were not generally circulated.

Moreover, any comparison with *Elicofon* is inapposite. There the plaintiff was a government-owned art museum, with re-

---

**8.** N.Y.C.P.L.R. § 214 provides:
　The following actions must be commenced within three years: ...
　　3. an action to recover a chattel or damages for the taking or detaining of a chattel;

**9.** The Second Circuit also held that even if the cause of action had accrued in 1946, when Eli-

cofon bought the paintings, "the then-applicable limitation period was tolled under New York's judicially-created 'non-recognition' toll because the United States did not recognize GDR until 1974, which precluded the [plaintiff] from intervening until then." 678 F.2d at 1161.

sources, knowledge and experience that far exceeded any means an individual such as Mrs. DeWeerth could muster to carry on a credible search for a missing painting.

For all of these reasons, I find that plaintiff did not unreasonably delay her demand for the return of the Monet, and her action is not barred on timeliness grounds.[10]

### V.

Mrs. Baldinger contends that even if plaintiff's claim to recover the Monet is timely, plaintiff has not established a superior right to possession of the painting by failing to prove that she owns the painting, and that the painting was stolen. She argues that Mrs. DeWeerth has not demonstrated her own prior valid title to the Monet to recover the painting from Mrs. Baldinger, who has possessed it as a good faith purchaser for over 25 years. I disagree.

■ To establish a cause of action in an action sounding in replevin[11] under New York law, Mrs. DeWeerth must show that she has an immediate and superior right to possession of the Monet. *Wurdeman v. Miller*, 633 F.Supp. 20, 22 (S.D.N.Y.1986) *citing Honeywell Information Systems, Inc. v. Demographic Systems, Inc.*, 396 F.Supp. 273, 275 (S.D.N.Y.1975), including proof of ownership. *Elicofon*, 536 F.Supp. at 852 *citing Honeywell Information Systems, Inc., supra*.

■ Through her testimony and the documentary evidence submitted at trial,[12] Mrs. DeWeerth has established that she was the owner of the Monet by inheritance from her father at the time it disappeared from her sister's home, and that she neither sold it nor entrusted it to anyone else to sell. Her testimony with respect to the 1943 photograph further supports that the Monet displayed in 1943 in her residence next to the Rodin sculpture is the same painting as is currently possessed by defendant.

Mrs. Baldinger, who indisputably purchased the Monet in good faith and for value from Wildenstein in 1957,[13] would

---

**10.** Even if plaintiff had unreasonably delayed her demand, defendant cannot show that she was prejudiced by the delay. She has argued that because of the delay the testimony of Frau von Palm, the only person who could testify as to what happened to the painting, has been irretrievably lost. This argument fails because it assumes, contrary to all the other evidence presented, that Frau von Palm's testimony would have been favorable to her.

It also fails because it is simply not true. Defendant could have deposed Reichenbach to attempt to trace the history of the painting's transfers, but she did not. Having failed to exhaust obvious paths of inquiry she cannot sustain her burden of proving that she was prejudiced.

Neither has she shown that plaintiff's delay was so prolonged and inexcusable as to amount to an abandonment of her right to the painting, *see Tiffany & Co. v. L'Argene Products Co.*, 67 Misc.2d 384, 324 N.Y.S.2d 326, 330–31 (Sup.Ct. N.Y.Co.1971), *aff'd.* 37 A.D.2d 699, 323 N.Y.S.2d 642 (1st Dept.1971), *app. dis'd.*, 29 N.Y.2d 484, 324 N.Y.S.2d 1030, 274 N.E.2d 314 (1971); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 750 n. 8, 448 N.E.2d 413 (Ct.App.1983), or to constitute a waiver of her rights and claims. Defendant's affirmative defense of estoppel in this context is also without merit.

**11.** According to the Practice Commentaries to Article 71 of the C.P.L.R., replevin is a term that

is no longer used in the C.P.L.R., and is not synonymous with an action to recover a chattel. It is "a procedure in the nature of a provisional remedy, which may be used as an incident to such action, by which an officer seizes the chattel before judgment. Both under the CPA and the C.P.L.R. an action to recover a chattel may proceed without seizure of the chattel." McLaughlin, *Practice Commentaries*, McKinney's Cons. Laws of N.Y., Book 7B, C.P.L.R. C7101:1 *et seq.* at 170–72. In any event, the Practice Commentaries suggest that an action under Article 71 "is one to establish a possessory right to a chattel superior to that asserted by defendant." *Id. See also East Side Car Wash, Inc. v. K.R.K. Capitol, Inc.*, 102 A.D.2d 157, 476 N.Y.S.2d 837, 840 (1st Dept.1984). Whether characterized as an action sounding in replevin or an action to recover a chattel, the burden is still on the plaintiff to establish that she has a superior right to possession.

**12.** The relevant exhibits, specifically the 1943 photograph (exhibit 5), have been in existence 20 years or more and thus contain hearsay admissible under the ancient documents exception of Fed.R.Evid. 803(16). Mrs. Baldinger admits the authenticity of these exhibits.

**13.** Because she acquired the painting from Wildenstein in 1957, seven years prior to New York's adoption of the Uniform Commercial Code, pre-Code law is controlling.

prevail only if she could trace her title back to Mrs. DeWeerth. This she cannot do. The trail back from Mrs. Baldinger leads through Wildenstein to Reichenbach, and stops there. There is no evidence before me with respect to how Reichenbach came into possession of the Monet.

■ Moreover, under New York law not even a bona fide purchaser can acquire valid title of a chattel from a thief, or from one who acquired the property from a thief. *See Elicofon*, 678 F.2d at 1160. I have inferred that the painting was stolen during the occupation of Frau von Palm's house by American soldiers, after plaintiff had sent the painting to her sister's house for safekeeping with no intention that it be sold. The defendant has introduced no evidence to the contrary. Rather, she has sought to shift the burden to plaintiff to prove that the painting was stolen and not sold or consigned by Frau von Palm. However, the burden of proof rests with the defendant to show some act by the plaintiff beyond merely entrusting his property to someone who then sells it to an innocent purchaser. *Cf. Hartford Accident & Ind. Co. v. Walston & Co.*, 21 N.Y.2d 219, 287 N.Y.S.2d 58, 68, 234 N.E.2d 230 (Ct.App. 1967) (stockbroker required to establish that it observed reasonable commercial standards in transferring stocks to establish it was bona fide purchaser to avoid liability to owner from whom they were stolen); *United States Fidelity & Guaranty Co. v. Leon*, 165 Misc. 549, 300 N.Y.S. 331, 334 (Municipal Ct.N.Y.Co.1937) (burden of proof upon defendant if he is asserting title to stolen bond to show he is bona fide holder, and if he is asserting title in his predecessor, that the latter was a bona fide holder).

Mrs. DeWeerth has thus established a superior right to possession of the Monet.

---

This is so because pursuant to § 10–101 and § 10–105, subsequently renumbered § 13–101 and § 13–105, the Uniform Commercial Code in New York applies to "transactions entered into and events occurring on and after the effective date specified in Section 10–105 of this Act [September 27, 1964]."

## VI.

### A. *Defendant's Counterclaim*

■ Defendant has alleged a counterclaim seeking damages for her "considerable personal distress and anguish" occasioned by plaintiff's claim that she is a converter, and for the diminution in value of the Monet caused by this litigation. Answer and Counterclaim ¶¶ 11–13.

Whether characterized as a claim for intentional infliction of emotional distress or as a claim for malicious prosecution, as plaintiff construes it, the counterclaim is without merit.

The New York Court of Appeals has ruled that to set forth a viable cause of action for intentional infliction of emotional distress, the allegations must:

... satisfy the rule set out in Restatement of Torts, Second, which we adopted in *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 373 N.E.2d 1215, that: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress" (§ 46, subd. [1]). Comment d to that section notes that: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 58 N.Y.2d 293 (Ct.App.1983).

The conduct complained of falls far short of these requirements.

Any attempt by defendant to assert a claim for malicious prosecution is premature:

[T]hat tort lies only when the judicial proceeding "begun in malice, without

---

Mrs. Baldinger relies heavily on U.C.C. 2–403, although she concedes that under both the U.C.C. and pre-U.C.C. law, title conveyed by a thief is void.

probable cause, ... finally ends in failure." It cannot be asserted as a counterclaim in the very action it challenges as malicious.

*Bank of Boston International of Miami v. Arguello Tefel*, 644 F.Supp. 1423, 1430 (E.D.N.Y.1986) *citing Kalso Systemet, Inc. v. Jacobs*, 474 F.Supp. 666, 670 (S.D.N.Y. 1979) (quoting *Grant v. City of Rochester*, 68 Misc.2d 358, 326 N.Y.S.2d 691, 693 (Sup. Ct.1971)).

Moreover, this claim is without merit because:

> [i]n order to establish a claim for malicious prosecution, ... a plaintiff must show among other matters that there was some interference with his person or property. This requirement is satisfied only if a court issues a provisional remedy, such as an attachment, an order of arrest or an injunction. No such remedy was issued in connection with [this] proceeding.

*Id. citing Tedeschi v. Smith Barney, Harris Upham & Co., Inc.*, 548 F.Supp. 1172 (S.D.N.Y.1982).

### B. Remaining Affirmative Defenses [14]

#### 1. Adverse Possession

■ "Five elements must be established in order to gain title by adverse possession: possession must be hostile and under claim of right, it must be actual, it must be open and notorious, it must be exclusive and it must be continuous." *Risi v. Interboro Industrial Parks, Inc.*, 99 A.D.2d 174, 470 N.Y.S.2d 174, 175 (2d Dept.1984) *citing Belotti v. Bickhardt*, 228 N.Y. 296, 127 N.E. 239 (Ct.App.1920). The Second Circuit in *Elicofon* observed that "[c]ourts and commentators have noted that the mere residential display of paintings may not constitute the type of open and notorious possession sufficient to afford notice to the true owner." 678 F.2d at 1164 n. 25 (citations omitted).

Except for two brief public exhibitions, one in 1957 for four days and the other in 1970 for a little more than a month, Mrs. Baldinger maintained the Monet exclusively in her home. Such possession is not sufficiently open and notorious to constitute adverse possession, and this defense must fail.

#### 2. Gratuitous Bailment

■ Defendant has also argued that plaintiff has no right to possession of the painting because she made a gratuitous bailment of the Monet. This contention is also without merit.

A gratuitous bailment is one for the benefit of the bailor only. *Pettinelli Motors, Inc. v. Morreale*, 242 N.Y.S.2d 78, 80 (Sup.Ct. Oneida Co. 1963).

Under New York law, a bailment is defined as:

> "[a] delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it."

*Rich v. Touche Ross & Co.*, 415 F.Supp. 95, 99 n. 2 (S.D.N.Y.1976) *citing Mays v. New York, N.H. & H.R. Co.*, 197 Misc. 1062, 97 N.Y.S.2d 909, 911 (1st Dept., App.T.1950).

A bailment "describes a result which in many instances does not flow from the conscious promises of the parties made in a bargaining process but from what the law regards as a fair approximation of their [intentions]."

*Id. citing Ellish v. Airport Parking Co.*, 42 A.D.2d 174, 345 N.Y.S.2d 650 (2d Dept. 1973), *aff'd on opinion below*, 34 N.Y.2d 882, 359 N.Y.S.2d 280, 316 N.E.2d 715 (1974).

As a threshold matter, it is questionable whether plaintiff's delivery of the Monet to her sister for safekeeping during the War constituted a bailment. Even if it did, however, the fact that it was gratuitous has no

---

**14.** I have already considered and rejected all but two of the affirmative defenses: (1) failure to state a claim upon which relief can be granted; (2) statute of limitations; (3) laches; (4) failure to exercise due diligence in pursuit of a claim, waiver and estoppel; (5) good title; and (6) abandonment.

relevance to the issue of title to the painting.

### VII.

In summary, plaintiff has shown by a fair preponderance of the credible evidence that she owned the Monet, that she did not sell it or authorize anyone to sell it on her behalf, and that defendant Baldinger currently has it in her possession and refuses to return it. The affirmative defenses and the counterclaim are without merit and are dismissed with prejudice. Judgment shall be rendered for the plaintiff and defendant is directed to deliver the painting to her.[15]

Plaintiff's counsel will submit a final judgment on notice pursuant to Rule 54, F.R.Civ.P. There is no just reason for delay.

A conference in this case will be held on May 7, 1987 at 9 a.m. in courtroom 2703 to chart the further course of the third-party litigation.

SO ORDERED.

---

**15.** Because the Monet is a "unique chattel", I may exercise my equitable jurisdiction to enter a judgment directing Mrs. Baldinger to deliver the painting to Mrs. DeWeerth. *See Elicofon,* 536 F.Supp. at 859 *citing* C.P.L.R. § 7109; *Cha-* *bert v. Robert & Co.,* 273 A.D. 237, 76 N.Y.S.2d 400 (1st Dept.1948); *Raftery v. World Film Corp.,* 180 A.D. 475, 167 N.Y.S. 1027 (1st Dept. 1917).