**Gerda Dorothea DEWEERTH, Plaintiff,**

v.

**Edith Marks BALDINGER, Defendant and Third–Party Plaintiff,**

v.

**WILDENSTEIN & CO., INC., Third–Party Defendant.**

No. 83 Civ. 1233 (VLB).

United States District Court, S.D. New York.

Oct. 16, 1992.

Joseph D. Becker, John R. Horan, Fox & Horan, New York City, for plaintiff.

Leslie Gordon Fagen, Paul, Weiss, Rifkin, Wharton and Garrison, New York City, for defendant.

Jeremy G. Epstein, New York City, for third party defendant.

## MEMORANDUM ORDER

### (RULE 60 APPLICATION)

VINCENT L. BRODERICK, District Judge.

### I

This action concerns plaintiff's claim to the ownership of a painting by Claude Monet entitled "Champs de Ble a Vetheuil" (the "Monet"), which was stolen from plaintiff in 1945 and purchased in good faith by the defendant in 1957 from third-party defendant Wildenstein & Co. On April 20, 1987, after a bench trial, I issued a decision including findings of fact and conclusions of law in this matter and ordered that judgment be rendered for the plaintiff requiring that the painting be returned to the plaintiff. *DeWeerth v. Baldinger,* 658 F.Supp. 688 (S.D.N.Y.1987) (the "April 20 Order") [1] As discussed in greater detail *infra,* that decision was subsequently reversed by the Court of Appeals. *DeWeerth v. Baldinger,* 836 F.2d 103 (2d Cir.1987), *cert. denied* 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (the "December 30 Order"). The Court of Appeals found that in this diversity case I had misapplied New York law.

Plaintiff has now moved for relief under Rule 60, Fed.R.Civ.P. The factual findings which I made with respect to the trial of this matter are necessary to consideration of plaintiff's motion and are repeated in part II below for convenience.

For the reasons set forth below, I conclude that the Rule 60 motion must be granted. In summary, the highest court of New York State has now ruled in *Guggenheim v. Lubell,* 77 N.Y.2d 311, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991), subsequent to the 1987 Second Circuit decision, that state law requires—and, according to the state court ruling, would previously have also required—a result which is consonant with my original determination. Because of the primacy of the state courts in determining interpretation of state law under principles of federalism, as discussed in greater detail below, the *Guggenheim* decision, albeit stating that it also reflects prior law, is a new development justifying Rule 60 relief.

The issue of laches, also discussed in greater detail below, was mentioned but left open in the 1987 Second Circuit decision, and raised anew by the defendant. The plight of good faith purchasers of art is an important factor in evaluating stolen art cases, as is the need to deter theft of art destined for the New York market. Both interests are relevant to balancing prejudice and reasonableness. Here, however, a nonbankrupt third party defendant from whom defendant purchased the stolen art remains in the case. Where upstream purchasers failed to exercise due care in purchasing, including examining the placement of an artwork in its context, its so-called "provenance," each defendant can, of course, follow up the chain of prior custody.

While in the wake of *Guggenheim, supra,* the Second Circuit declined to alter its mandate upon motion, *Standard Oil Co. v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976) suggests that this may have been because the district court rather than the appellate court is the appropriate initial forum for seeking redress due to post-decisional changes in law or facts. *Fine v. Bellefonte Underwriters Ins. Co.,* 758 F.2d 50, 52 (2d Cir.1985), *cert. denied* 474 U.S. 826, 106 S.Ct. 86, 88 L.Ed.2d 70 (1985) also indicates that the district court is the appropriate tribunal where there is, as I find here, a "material change of circumstances...."—in this instance because of the ruling of the State's highest court contrary to the 1987 federal appellate decision, and the state Court's assertion that its position reflects prior state law as well.[2]

---

1. The bench trial was conducted on a "submitted" basis in which I reviewed written and videotaped depositions and exhibits submitted by the parties. *See* 658 F.Supp. at 690.

2. Should my interpretation of *Standard Oil* and *Fine* be incorrect, relief could still be afforded by means of the procedure utilized in the pre-*Standard Oil* decision in *United States v. Fernandez,* 506 F.2d 1200 (2d Cir.1974). In *Fernandez,*

## II

There follows a reiteration of certain factual findings contained in my decision of April 20, 1987:

"The Monet is an impressionistic depiction in oil of a wheat field, a village and trees near Vetheuil, France. It measures 65 centimeters by 81 centimeters, and is signed and dated "Claude Monet '79". Mrs. DeWeerth's father, Karl von der Heydt, purchased the Monet in or about 1908, and he thereafter kept it in his house in Bad Godesberg, West Germany. Plaintiff inherited the Monet from her father after his death on August 9, 1922, in the division of the works and objects of art in his estate. With the exception of the years 1927 to 1929, when the Monet was kept in her mother's house, plaintiff kept the Monet in her residence in Wuppertal–Elberfeld from 1922 until August 1943, where it was on display on a wall next to a sculpture by Auguste Rodin, also inherited from her father. This sculpture is still in plaintiff's possession at her West German residence, and plaintiff has submitted a 1943 photograph showing the Monet and the Rodin displayed together in her residence. From that time until the present, she neither sold nor otherwise disposed of the Monet, nor did she entrust the Monet to anyone else to sell or otherwise dispose of it.

"In August 1943, during the Second World War (the "War"), Mrs. DeWeerth sent the Monet, along with the Rodin sculpture and other valuables, by van to her sister Gisela von Palm (now deceased) in Oberbalzheim in Southern Germany, for safekeeping. Although the van arrived, plaintiff never saw the Monet again. In the fall of 1945, Gisela von Palm informed plaintiff of the disappearance of the Monet from Mrs. von Palm's house in Oberbalzheim. There is no direct evidence as to what caused the disappearance of the Monet. American soldiers were quartered in the house after the close of the War in 1945, and it was after they had left that its disappearance was noted. I infer that either one of those soldiers, or someone else, stole the painting from the von Palm house where it had been sent for safekeeping.

"Mrs. DeWeerth was approximately 50 years old when she learned of the Monet's disappearance. Subsequently she made efforts to locate it. In 1946 she reported the loss of the Monet to the military government then administering the Bonn–Cologne area after the end of the War. In 1948 she solicited the assistance of her lawyer, Dr. Heinz Frowein, in attempting to find and recover it. Plaintiff also made inquiries in 1955 of one Dr. Alfred Stange, known to Mrs. DeWeerth as an art expert. In 1957 she reported the Monet as missing to the *Bundeskriminalamt* (the West German federal bureau of investigation) in Bonn. All of these efforts to find the Monet were unsuccessful.

"By December 1956 however, the Monet had found its way to the United States through Switzerland. Third-party defendant Wildenstein & Co., Inc. ("Wildenstein"), an art gallery in New York City, appears to have acquired the Monet on consignment from Francois Reichenbach, an art dealer from Geneva, Switzerland, in about December 1956. From December 1956 to June 1957, Wildenstein had possession of the Monet in New York. A Wildenstein record shows a 1962 payment, or credit, to Reichenbach, evidently for the Monet.

"In June 1957, Wildenstein delivered the Monet for inspection to Mrs. Baldinger at her residence at 710 Park Avenue, New York, New York. Mrs. Baldinger, after several days, purchased the Monet in good faith and for value from Wildenstein on or about June 17, 1957.

"After its purchase by Mrs. Baldinger, the Monet was publicly exhibited only on two occasions. Mrs. Baldinger exhibited the Monet at a benefit held in the Waldorf–Astoria Hotel in New York City,

---

the Court of Appeals reversed a district court modification of a prior ruling as contrary to its mandate, but simultaneously issued a new man-

date authorizing the district court to take the action involved.

from October 29 to November 1, 1957, and loaned it to Wildenstein for display during a Wildenstein exhibition entitled "One Hundred Years of Impressionism" held April 2 to May 9, 1970 at its gallery in New York City. At the close of this exhibition, Wildenstein returned the Monet to Mrs. Baldinger. Except for those two exhibitions, Mrs. Baldinger maintained the Monet exclusively in her residence at 710 Park Avenue, New York City, from June 1957 to the present date.

"There are only four published references to the Monet in the art literature: two of them are in catalogues in connection with the exhibitions already cited, and the other two are in publications with which Wildenstein was apparently connected:

"(1) *Claude Monet: Bibliographie et Catalogue Raisonne, Vol. 1 1840–1881.* Published by la Bibliotheque des Arts, Lausanne, Paris; introduction by Daniel Wildenstein; collaborators Rodelphe Walter, Sylvie Crussard, and the Foundation Wildenstein, 1974, Geneva; painting no. 595.

"(2) The exhibition catalogue *One Hundred Years of Impressionism, A Tribute to Durand–Ruel, A Loan Exhibition,* April 2—May 9, 1970, Wildenstein Gallery, New York; painting no. 43.

"(3) *Monet: Impressions,* Daniel Wildenstein, published in New York, 1967, Library of Congress call no. ND553.M76W5313.

"(4) The exhibition catalogue *Festival of Art,* October 29—November 1, 1957, Waldorf–Astoria Hotel, New York; item 125.

"In or soon after July 1981, plaintiff, through the efforts of her nephew Peter von der Heydt, discovered that the Monet had been exhibited in 1970 at the aforementioned Wildenstein loan exhibition. Plaintiff thereafter retained counsel in New York in 1982 to determine whether Wildenstein knew the identity of the present possessor of the Monet. When Wildenstein refused to disclose the possessor's identity or the Monet's whereabouts, plaintiff commenced a proceeding in November 1982 against Wildenstein in New York State Supreme Court seeking "disclosure to aid in bringing an action." N.Y.C.P.L.R. § 3102(c). On December 1, 1982, the State Supreme Court found for the plaintiff, ordering Wildenstein to reveal the identity of the possessor. Plaintiff thereafter learned that defendant Baldinger possessed the Monet.

"By letter to Baldinger dated December 27, 1982, plaintiff demanded return of the Monet. By letter dated February 1, 1983, Baldinger refused the demand. This action ensued."

April 20 Order, 658 F.Supp. at 690–692.

### III

In my April 20, 1987 decision, I inferred that the Monet had been stolen from Frau von Palm's home in Germany and subsequently passed through a series of parties to Mrs. Baldinger. Applying New York law, which holds that not even a bona-fide purchaser can acquire valid title from one who acquires title from a thief, I held that Mrs. DeWeerth had a right of title to the Monet superior to that of Mrs. Baldinger. I also held that plaintiff had timely commenced her suit pursuant to the three year limitations period applicable to actions seeking the recovery of stolen property provided by New York Civil Practice Law and Rules § 214 ("Section 214"). It was in accordance with these findings that judgment was entered for the plaintiff, directing that the Monet be returned to her.

In reversing the judgment, the Court of Appeals held that plaintiff's claim was barred by Section 214's three year limitations period. The Second Circuit noted that under New York law, where a plaintiff seeks recovery of a stolen chattel from one who innocently purchases such property, Section 214's limitations period does not begin to run until a demand for the return of the property has been made and that demand is refused. The Court also noted that New York law required that a plaintiff make such a demand within a reasonable period of time subsequent to learning the identity of a chattel's current possessor. In these respects, the Court did not disturb

the legal conclusions which I had arrived at in my decision.

The Court then went on to hold that a plaintiff seeking the recovery of stolen property in New York had "a duty of reasonable diligence in attempting to locate stolen property" and that absent a showing that such diligence had been exercised, a chattel owner's otherwise timely suit would be time barred. 836 F.2d at 108. While acknowledging that this due diligence requirement had not previously been applied by the New York courts, the Court determined that its new rule was a justifiable application of New York law for three reasons.

First, the Court said that New York had a "policy of favoring the good faith purchaser" and of discouraging stale claims. *Id.* at 109.

Second, it noted that its decision brought the law in New York into harmony with the law of other jurisdictions. New York courts had taken a uniquely pro-original owner position on issues in which the rights of original owners were balanced against those of subsequent purchasers. This minority position, the Court of Appeals pointed out, put New York's demand and refusal rule at odds with the rules applicable in other states. New York law needed to be made more harmonious with the law applicable in other jurisdictions:

> Other jurisdictions have adopted limitations rules that encourage property owners to search for their missing goods. In virtually every state except New York, an action for conversion accrues when a good-faith purchaser acquires stolen property; demand and refusal are unnecessary. (citations omitted) ... It is true that New York has chosen to depart from the majority view. Nevertheless, the fact that plaintiff's interpretation of New York law would exaggerate its inconsistency with the law of other jurisdictions weighs against adopting such a view.

836 F.2d at 109.

Finally, the Court stated that the imposition of a due diligence requirement would further the general policy promoted by any statute of limitations; the protection of defendants from stale claims. *Id.* at 108–109.

I had held that regardless of whether or not New York law could be construed as imposing a due diligence requirement upon original owners, plaintiff's suit would have been timely commenced, since the evidence demonstrated that the plaintiff made a " 'diligent although fruitless effort' " to locate the Monet. 658 F.Supp. at 694, quoting *Kunstsammlungen Zu Weimar v. Elicofon,* 536 F.Supp. 829, 849 (E.D.N.Y.1981), *aff'd* 678 F.2d 1150, 1160 (2nd Cir.1982). The Court of Appeals treated this finding as a legal conclusion and reviewed it *de novo,* reaching an opposite conclusion. It held that DeWeerth's efforts to locate the Monet had been "minimal" and that she had failed to satisfy the due diligence requirement the Court announced in its ruling.

On February 5, 1988 the Second Circuit denied DeWeerth's petition for rehearing and on February 19, 1988 the mandate of the Court of Appeals directing that the judgment in favor of plaintiff be reversed was filed in this court. Plaintiff's petition for a writ of certiorari was denied by the United States Supreme Court on June 13, 1988.

IV

On February 14, 1991 the New York Court of Appeals, in an unrelated case, considered the identical issue which had been ruled upon by the Second Circuit in *DeWeerth:* whether or not New York law imposed a duty of due diligence upon owners attempting to recover stolen property from subsequent good faith purchasers. In a unanimous decision written by Chief Judge Wachtler, that Court ruled that no such duty existed, or had existed, under New York law. *Guggenheim v. Lubell,* 77 N.Y.2d 311, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991).[3]

---

**3.** The state trial court in *Guggenheim v. Lubell* had granted summary judgment in favor of the subsequent purchaser, relying upon the Second Circuit's decision in *DeWeerth.* See 77 N.Y.2d

The New York Court of Appeals concluded that New York's demand and refusal rule, which would be substantially modified by the imposition of a due-diligence requirement, was supported by prior New York case law. The Court cited in its ruling the fact that New York's Governor had recently vetoed a bill which would have barred certain suits seeking the recovery of stolen art works from non-profit institutions three years after such institutions gave a statutorily specified notice that they possessed such objects. In vetoing this bill, the Governor expressed concern that its enactment "would have caused New York to become 'a haven for cultural property stolen abroad'". 567 N.Y.S.2d at 627, 569 N.E.2d at 430 (quoting Veto Message of Governor Cuomo, New York State Assembly Bill 11462–A [1986]).

Although the Second Circuit's decision in *DeWeerth* concerned an unrelated controversy, the New York Court of Appeals in *Guggenheim* explicitly held that the due diligence requirement announced in *DeWeerth* was contrary to state law:

We have reexamined the relevant New York case law and we conclude that the Second Circuit should not have imposed a duty of reasonable diligence on the owners of stolen art work for purposes of the Statute of Limitations.

... The history of [proposed legislation seeking to establish a discovery rule for the recovery of stolen art works] when considered together with the abundant case law spelling out the demand and refusal rule, convince us that that rule remains the law in New York and that there is no reason to obscure its straightforward protection of true owners by creating a duty of reasonable diligence.

77 N.Y.2d at 319, 567 N.Y.S.2d at 626–627, 569 N.E.2d at 429–430.

In May 1991 plaintiff moved before the Second Circuit for the recall of its mandate of February 19, 1988, arguing that since the New York Court of Appeals had held the *DeWeerth* decision to have been incorrect, the Court was required to withdraw its mandate, vacate its judgment and affirm the judgment issued in the district court. This motion was denied without opinion.

V

The "ultimate source for state law adjudication in diversity cases is the law as established by the constitution, statutes, or authoritative court decisions of the state." *Factors Etc. Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2nd Cir.1981), *cert. denied* 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982). Accordingly, a "federal court sitting in diversity must follow the law directed by the Supreme Court of the state whose law is found to be applicable ..." *Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2nd Cir.1987), *cert. denied* 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 see also *Deeper Life Christian Fellowship Inc. v. Sobol*, 948 F.2d 79, 84 (2nd Cir. 1991).

Primacy of state court interpretation in matters of state law is a constitutional and statutory principle dating back to the founding of the Republic. As a matter of statutory construction, the principle was originally set forth in Section 34 of the Judiciary Act of 1789, the "Rules of Decision Act".[4] As amended in 1948, the Act provides:

The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

In *Swift v. Tyson*, 16 Pet. (41 U.S.) 1, 10 L.Ed. 865 (1842), the United States Supreme Court held that the Rules of Decision Act's reference to the "laws of the

---

at 316; 567 N.Y.S.2d at 625, 569 N.E.2d at 428. The Appellate Division, Second Department modified the trial court judgment to deny summary judgment; it dismissed a statute of limitations defense; and it certified the question of the propriety of its disposition to the New York Court of Appeals. 153 A.D.2d 143, 550 N.Y.S.2d 618 (1990).

**4.** Act of Sept. 24, 1789, 1 Stat. 92, codified as amended at 28 U.S.C. § 1652.

several states" meant that the federal courts were bound to apply state statutes and constitutional enactments, as well as to follow those state court decisions which either interpreted such enactments or dealt with questions of real estate or other "immovable" matters of local law. The Court held that on issues of general commercial law, however, federal courts were free to disregard state court decisions in favor of those "general principles and doctrines of commercial jurisprudence" which the federal courts found most appropriate. 41 U.S. at 18–19. In subsequent years, although the *Swift* doctrine remained elusive of precise definition, the areas of "general law" pursuant to which the federal courts became free to fashion their own pronouncements were eventually construed to include a wide range of subjects. See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 75–76, 58 S.Ct. 817, 821, 82 L.Ed. 1188 (1938).

The Supreme Court repudiated the *Swift* doctrine in *Erie*. In *Erie*, the Court declared that federal courts were bound to follow state law, including the construction of those laws by a state's highest court, on any matter not governed by the federal Constitution or a federal statute.

The *Erie* decision was based in part upon the Rules of Decision Act and in part upon constitutionally based considerations of federalism, some of which are particularly relevant here. *Erie* held that the application of differing rules to the same issues by federal and state courts had given plaintiffs who were non-residents of a state in which a defendant resided the advantage of being able to choose the most advantageous forum in which to sue. Thus, according to Justice Brandeis, "the doctrine rendered impossible equal protection of the law" since it arbitrarily favored non-resident plaintiffs over resident defendants. 304 U.S. at 74–75, 58 S.Ct. at 820–821.

*Erie* also recognized that one of the central goals of the *Swift* doctrine—to promote national uniformity in matters of "general law"—had proved illusory and

that the uncertainty of the "demarcation between the province of general law and that of local law [had] developed a new well of uncertainties." 304 U.S. at 74, 58 S.Ct. at 820. Thus *Erie* sought to eliminate the "spurious uniformity" of the *Swift* doctrine.[5]

*Erie* can also be seen as implicitly recognizing that state judges are often more knowledgeable in applying the intricacies of state law and policy than their federal counterparts. *Erie* placed the primary responsibility for developing and interpreting state law upon a locally chosen judiciary which would be especially sensitive to the dynamics of the legal rules applicable in its jurisdiction.

*Erie* held that no provision of the Constitution purported to bestow upon the federal courts the power to declare the substantive rules governing state common law and that the *Swift* doctrine constituted "an unconstitutional assumption of powers by courts of the United States." 304 U.S. at 78–80, 58 S.Ct. at 822–823, quoting *Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 370–372, 30 S.Ct. 140, 147–148, 54 L.Ed. 228 (Holmes J., dissenting). Justice Brandeis approvingly cited the dissenting opinion of Justice Field in *Baltimore & Ohio R. Co. v. Baugh*, 149 U.S. 368, 401, 13 S.Ct. 914, 927, 37 L.Ed. 772 in the course of describing the fundamental principle at stake:

'[T]here stands ... the Constitution of the United States, which recognizes and preserves the autonomy and independence of the States—independence in their legislative and independence in their judicial departments. Supervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence.'

**5.** See Friendly, *In Praise of Erie—and of the New Federal Common Law,* 39 N.Y.U.L.Rev. 383, 384 (1964).

*Erie R. Co. v. Tompkins*, 304 U.S. at 78–79, 58 S.Ct. at 822–823, quoting *Baltimore & Ohio R. Co. v. Baugh*, 149 U.S. 368, 401, 13 S.Ct. 914, 927 (Field J., dissenting).

It has been said that *Erie* "implicates, indeed perhaps it is, the very essence of our federalism".[6] The protection of state autonomy has continued to be a vital component of Supreme Court jurisprudence over a wide range of subject areas. The underlying constitutional foundation of *Erie* was reaffirmed in subsequent Supreme Court decisions. See *Bernhardt v. Polygraphic Company of America Inc.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956); *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

When principles underlying *Erie* interact with other established principles governing the conduct of business in our courts, the resulting determination must take cognizance of *Erie*'s position at the heart of our system.

### VI

With respect to many of the decisions in which the federal courts are called upon to interpret and apply state law, *Erie* lends itself to relatively straightforward application. Were this a case in which I was being called upon merely to determine whether to follow an interpretation of state law reached by the federal appellate court or one subsequently articulated by New York's highest court, the result would be obvious.

In this case, however, the *Erie* rule must be balanced against the interest in finality of litigation. Plaintiff moved for relief in an earlier motion before the Second Circuit. I must therefore determine how to interpret that Court's denial of plaintiff's motion. The Second Circuit's ruling on plaintiff's motion must be analyzed in terms of the relationships between *Erie*, and Rule

60(b) in order to determine the proper treatment of plaintiff's application before me.

### VII

The range of fundamental policy and constitutional considerations which have informed the *Erie* doctrine are fully evident in the present case. Failure to act on the present Rule 60 motion would deny Mrs. DeWeerth the right to recover her property solely because she initially brought this action in federal rather than state court. Had Mrs. DeWeerth brought suit in state court, her claim would have been deemed timely commenced under the applicable statute of limitations.

Such inconsistency is exactly the type of result that *Erie* was enacted to avoid. As Justice Frankfurter noted, "[t]he nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result." *Guaranty Trust Company of New York v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945).

As noted *supra*, the Second Circuit's decision in *DeWeerth* was partially based upon the Court's view that New York's rules governing the recovery of stolen property needed to be made more harmonious with the rules of other jurisdictions. It was necessary for the State of New York to impose a due diligence requirement, the Second Circuit held, not only because it made sense as a matter of state law precedent and policy, but because the failure to change New York's demand and refusal law "would exaggerate its inconsistency with the law of other jurisdictions." 836 F.2d at 109. The subsequent decision of the New York Court of Appeals in *Guggenheim*, however, provides a construction of New York law which, under *Erie*, is controlling,[7] and which involved an explicit re-

---

**6.** Ely, *The Irrepressible Myth of Erie*, 87 Harv. L.Rev. 693, 694 (1974).

**7.** Judge Friendly has noted that among the many reasons for *Swift*'s failure to achieve national legal uniformity in the years prior to *Erie* was the difficulty of having any one federal

court, particularly below the level of the United States Supreme Court, lead other state and federal courts by its persuasive example. "Although the New York Court of Appeals might bow to the superior wisdom of the Supreme Court ... on a point of commercial law, one

jection of the Second Circuit's *DeWeerth* approach.[8]

The *Guggenheim* Court grounded its decision on a range of policy considerations growing out of its concern that any legal rules established by the courts be cognizant of New York's special role as a world art center:

> The backdrop for this replevin action ... is the New York City art market, where masterpieces command extraordinary prices at auction and illicit dealing in stolen merchandise is an industry all its own ...

> [O]ur decision today is in part influenced by our recognition that New York enjoys a worldwide reputation as a preeminent cultural center. To place the burden of locating stolen artwork on the true owner and to foreclose the rights of that owner to recover its property if the burden is not met would, we believe, encourage illicit trafficking in stolen art. 77 N.Y.2d at 314, 320, 567 N.Y.S.2d at 624, 628, 569 N.E.2d at 427, 431.

As stated in *Hoelzer v. City of Stamford*, 933 F.2d 1131, (2d Cir.1991):

> Underlying the New York court's decision [in *Guggenheim*] to dispense with the due diligence requirement was an awareness that lost art is extremely difficult to recover, and a policy determination that the burden of proving ownership should not be shifted onto the 'wronged owner' who has already suffered the theft of valuable property.

This court is "obliged to give full effect to decisions of New York's highest court on issues involving the application of New York law." *Sanchez v. United States*, 696 F.2d 213, 216 (2nd Cir.1982).

## VIII

Plaintiff's instant motion is brought under Federal Rules of Civil Procedure 60(b)(5) and (6). Pursuant to Rule 60(b)(5), a party may be relieved from a final judgment or order, *inter alia*, where the judgment "has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application." Rule 60(b)(6) provides for relief from a final judgment where there is "any other reason justifying relief from the operation of the judgment." Motions pursuant to Rule 60(b) are addressed to the sound discretion of the district court. *Mendell In Behalf of Viacom, Inc. v. Gollust*, 909 F.2d 724, 731 (2nd Cir.1990), *aff'd* — U.S. ——, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991).

Rule 60(b)(6) "confers broad discretion on the trial court to grant relief when 'appropriate to accomplish justice'." *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 n. 2 (2nd Cir.1977), *cert. denied* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978) (quotation omitted). "It is 'properly invoked where there are extraordinary circumstances,' [citations omitted] or where the judgment may work an extreme and undue hardship, [citations omitted] and 'should be liberally construed when substantial justice will thus be served' ". *Matarese v. LeFevre*, 801 F.2d 98, 106 (2nd Cir.1986), *cert. denied* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987).

"A postjudgment change in the law having retroactive application may, in special circumstances, constitute an extraordinary circumstance warranting vacation of a judgment." *Matarese v. LeFevre*, 801 F.2d 98, 106, *citing, inter alia, Pierce v. Cook & Co.*, 518 F.2d 720 (10th Cir.1975), *cert.*

---

could hardly expect similar deference to a decision of three judges of an intermediate federal appeals court." Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U.L.Rev. 393, 406 (1964).

**8.** A decision in favor of defendant on this Rule 60 application would further the admittedly desirable goal of national legal uniformity, but where interpretation of state law is concerned, this cannot be done where contrary to the state's own construction of that law. The constitutional objective of limiting interstate trade barriers is, of course, furthered primarily by authorization of congressional action under Article I § 8 cl 3, and by application of that clause to bar undue burdens on commerce created by state or local action, not claimed to be involved here.

*denied* 423 U.S. 1079, 96 S.Ct. 866, 47 L.Ed.2d 89 (1976); *McGrath v. Potash,* 199 F.2d 166 (D.C.Cir.1952); see also *Adler v. Berg Harmon Associates,* 790 F.Supp. 1235, 1245 n. 10 (S.D.N.Y.1992).

Even more directly on point to the facts here, however, courts have widely ruled that where a United States Supreme Court decision enacted subsequent to the issuance of an appeals court mandate "showed that [the] original judgment was demonstrably wrong," an appellate mandate may be properly withdrawn, even where the superseding determination comes more than a year after the appellate mandate has been issued. *See American Iron and Steel Institute v. E.P.A.,* 560 F.2d 589, 594 (3d Cir.1977), citing *Greater Boston Television Corp. v. F.C.C.,* 463 F.2d 268, 278 n. 12 (D.C.Cir.1971), and quoting *Legate v. Maloney,* 348 F.2d 164, 166 (1st Cir.1965); see also *Zipfel v. Halliburton Co.,* 861 F.2d 565 (9th Cir.1988); *Adams v. Merrill, Lynch, Pierce, Fenner & Smith,* 888 F.2d 696 (10th Cir.1988). At least one Second Circuit case has also explicitly relied upon this principle. See *Tarkington v. United States Lines Co.,* 222 F.2d 358 (2nd Cir.1955).

In *American Iron and Steel,* plaintiffs requested the recall of a Third Circuit mandate, arguing that a United States Supreme Court decision on a series of environmental regulations rendered one year and four months subsequent to a related decision by the Third Circuit had called the correctness of the Third Circuit's determination into question. In ruling on plaintiff's motion, the Third Circuit held that the Supreme Court's decision had not disapproved the Third Circuit's holding and indeed had cited to the Appeals Court ruling at numerous points in its opinion. The court nevertheless determined that its mandate should be recalled, reasoning that although the Appeals Court ruling had not been "demonstrably wrong", it had evidenced a sufficient "disparity" with the Supreme Court's ruling to indicate the need for corrective action:

> Where, as here, a decision of the Supreme Court—the preeminent tribunal in our judicial system—departs in some pivotal aspects from those of lower federal courts, amendatory action may be in order to bring the pronouncements of the latter courts into line with the views of the former.... recall of a mandate traditionally has been warranted when and to the extent necessary "to protect the integrity" of a court's earlier judgment. Certainly, such integrity may be jeopardized when the solemn declarations of a court are called into question by a later Supreme Court opinion.

*American Iron and Steel,* 560 F.2d at 596 (citations omitted). Here, of course, the highest court as to matters of New York state law is New York's Court of Appeals.

In addition to its concern that a subsequent Supreme Court decision had called its earlier ruling into question, the *American Iron and Steel* court determined to withdraw its mandate by virtue of a *"confluence* of several unusual factors" present in that case. 560 F.2d at 600 (emphasis in original). As in *American Iron and Steel,* critical factors, albeit different from the considerations utilized by the court in *American Iron and Steel,* argue for granting plaintiff's motion here.

In contrast to the arguable disparity created by the subsequent Supreme Court opinion treated in *American Iron and Steel,* the New York Court of Appeals in this instance did not issue an opinion which created an arguable disparity with the results reached by the Second Circuit; it explicitly held contrary to *DeWeerth.* In addition, the New York Court of Appeals in *Guggenheim* indicated that its interpretation of state law as applied in cases of this type is of great importance to the art industry in New York.

*Erie* principles have served in other cases as the basis for a reversal of final judgments after a subsequent clarification of the law. See *Pierce v. Cook & Co.,* 518 F.2d 720 (10th Cir.), *cert. denied* 423 U.S. 1079, 96 S.Ct. 866, 47 L.Ed.2d 89 (1976). *Pierce* concerned two plaintiffs asserting claims arising out of a common vehicular accident. One plaintiff's claim was heard in federal court and the second plaintiff

had his case determined in a state forum. In the federal suit, the Tenth Circuit affirmed the grant of summary judgment to defendant in the case, applying a well established rule of Oklahoma state law. In the state suit, however, after having his claim against the same defendant dismissed by the trial court, plaintiff appealed to the Oklahoma Supreme Court, which overruled the decision upon which both the state trial court and the Tenth Circuit had relied.

Although the Oklahoma Supreme Court decision had come more than three years subsequent to the Tenth Circuit's dismissal of the federal plaintiff's claims, the Tenth Circuit granted plaintiff's 60(b)(6) motion:

> We are concerned with an action in which federal jurisdiction depends on diversity. In diversity jurisdiction cases the results in federal court should be substantially the same as those in state court litigation arising out of the same transaction or occurrence. Here they were not ... The outcome determination principle mandated by Erie v. Tompkins has been violated.

518 F.2d at 723 (citations omitted); see also *First American National Bank of Nashville v. Bonded Elevator, Inc.* 111 F.R.D. 74 (W.D.Ky.1986).[9]

As *American Iron and Steel* and *Pierce* demonstrate, the fact that the New York Court of Appeals decision in *Guggenheim* came three years subsequent to the Second Circuit's interpretation of New York's demand and refusal law does not bar plaintiff's claim here. Indeed, courts have granted Rule 60(b)(6) relief when the periods between an initial judgment and a subsequent superseding decision spanned substantially greater periods of time. See *Tsakonites v. Transpacific Carriers*

*Corp.,* 322 F.Supp. 722 (S.D.N.Y.1970) (granting 60(b)(6) relief where more than a five year period intervened between the district court's judgment and a subsequent United States Supreme. Court decision which indicated that the district court judgment was error.)

■■ In order to prevent the working of an extreme and undue hardship upon plaintiff, to accomplish substantial justice and to act with appropriate regard for the principles of federalism which underlie our dual judicial system in this extraordinary case, I hold plaintiff is entitled to similar relief here.[10]

## IX

■ Apart from Rule 60(b)(6), a party may obtain relief under Rule 60(b)(5) where "it is no longer equitable that the judgment should have prospective application." Although the term "prospective application" as utilized in this rule has never been susceptible of precise definition, it has been held to apply where a judgment is " 'executory' or involves the 'supervision of changing conduct or conditions' within the meaning of [the Supreme Court's decisions in *United States v. Swift & Co,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) and *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856).]" *Twelve John Does v. District of Columbia,* 841 F.2d 1133, 1138 (D.C.Cir. 1988).

Rule 60(b)(5)'s prospective application clause has most often been utilized to modify judgments granting injunctive relief; where injunctive relief has been awarded, and the law upon which such relief is premised later changes, a court may amend its injunctive decree. See *Rufo v. Inmates of*

---

**9.** *Pierce* is distinguishable from the instant action in that *Pierce* involved claims arising out of a common accident. With respect to the *Erie* principles at stake, however, the facts here provide a more compelling basis for relief than the facts at issue in *Pierce.* In *Pierce,* the Oklahoma Supreme Court overruled previous state case law which the Tenth Circuit had relied upon in reaching its decision. Here, by contrast, the *Guggenheim* Court did not change New York law but found state law to have been contrary to *DeWeerth* all along. While New York law was held in *Guggenheim* not to have changed, the *Guggenheim* opinion is itself, of course, a new development.

**10.** A Rule 60(b)(6) motion may not serve as a substitute for a plaintiff's failure to pursue an appeal. *Matarese v. LeFevre,* 801 F.2d 98, 107 (2d Cir.1986). Here, however, where plaintiff pursued all of her available appellate remedies, this principle does not present a barrier.

*Suffolk County Jail*, — U.S. —, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *System Federation No. 91 Railway Employees Department, AFL–CIO v. Wright*, 364 U.S. 642, 650 n. 6, 81 S.Ct. 368, 372 n. 6, 5 L.Ed.2d 349 (1960) ("There are many cases where a mere change in decisional law has been held to justify modification of an outstanding injunction" [citing cases] ). At the other end of the spectrum, a money judgment will not usually be considered a judgment with "prospective application" pursuant to Rule 60(b)(5). See *Twelve John Does*, 841 F.2d at 1138.

The relief plaintiff seeks in this case, the return of a stolen painting, falls somewhere between the supervisory injunction and monetary judgment cases described above. The relief plaintiff seeks here is a form of specific performance, generically injunctive in nature—the physical return of a unique piece of art, rather than money damages. Transfer and possible international shipment of a valuable work of art may involve some further recourse to the court, but do not involve the level of judicial supervision required where changing conduct or conditions must be monitored. Although not by itself conclusive, the continuing effect of the judgment on future custody of the painting, in contrast to the effect of such a judgment upon fungible items such as money, is also relevant. Without holding that *res judicata* consequences of a decision are in themselves necessarily sufficient to trigger applicability of Rule 60(b)(5), the importance of the *res judicata* or "quiet title" effect is magnified when a future chain of custody and ownership of a valuable art object are affected.[11]

Since I find that plaintiff has in any event clearly stated valid grounds for relief under Rule 60(b)(6), it is unnecessary to determine whether relief would also be justified pursuant to Rule 60(b)(5), but on balance I conclude that plaintiff is entitled to relief on this additional ground.

11. In *Kirksey v. City of Jackson*, 714 F.2d 42 (5th Cir.1983) the Court indicated that Rule 60(b)(5) relief may be justified if the law changes subsequent to the initial decision and if the parties would be bound by the previous judgment by

X

I must also consider the impact which the Second Circuit's denial without opinion of plaintiff's motion to recall its mandate should have on the disposition of plaintiff's motion here. Where an appeals court rules on an issue, "[t]he court of appeals' rulings are the law of the case, and the district court is bound to follow them; it has no jurisdiction to review or alter them." *Eutectic Corp. v. Metco Inc.*, 597 F.2d 32, 34 (2d Cir.1979). The law of the case doctrine, however, applies only to issues which have been reviewed and determined by a court. "While it is true that issues considered and disposed of by an appellate court on appeal cannot thereafter be altered by a district court, it may consider matters not explicitly or implicitly decided." *Panama Processes, S.A. v. Cities Service Co.*, 789 F.2d 991, 994 (2d Cir.1986) (citations omitted). In this case, the lack of any opinion accompanying the Court of Appeals' denial of plaintiff's motion to recall its mandate requires that this court attempt to determine the basis for the Second Circuit's decision. Either of two possible rationales may have been the basis for the Court's ruling.

First, the Court could have determined that plaintiff had not stated any ground for relief pursuant to Rule 60(b) from the Court's mandate with respect to the due diligence requirement. As discussed in detail above, however, denial of plaintiff's motion on this ground would, I believe, raise serious questions about the relationship between the state and federal courts under *Erie*, resulting in a denial of rights which would have flowed to the plaintiff under state law. I do not believe that the Court would have denied relief on this ground. As the Second Circuit noted in one diversity case in which it modified its previous decision after a state Supreme Court ruling reversed an intermediate state

*res judicata:* "If a dismissal would bar a new and independent action between the same parties based on the same claims … then it would have 'prospective application' by virtue of the continuing effect of the bar." Id. at 43.

court order upon which the Court had relied, "[t]his Circuit has long shown considerable willingness to correct what it believed an erroneous interpretation of the law when an intervening state decision seemed to indicate a better view." *Braniff Airways Inc. v. Curtiss–Wright Corp.*, 424 F.2d 427, 429 (2d Cir.), *cert. denied* 400 U.S. 829, 91 S.Ct. 59, 27 L.Ed.2d 59 (1970). I have no reason to believe the Court would not have followed the same reasoning here.

There is a more probable alternative rationale which the Court of Appeals could have adopted in denying plaintiff's motion, namely that the relief should properly have been sought from the district court in the first instance.

In *Standard Oil Company v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976) the Supreme Court held that a Rule 60(b) motion based on events subsequent to an appellate mandate and seeking to overturn a judgment summarily affirmed by the Supreme Court, could be pursued in the district court without the leave of the Supreme Court and without withdrawal of the Supreme Court's mandate. The Supreme Court reasoned that in cases where a litigant sought relief from a final judgment based upon events occurring subsequent to an appellate ruling, the trial court, rather than the appellate court, "is in a much better position to pass upon the issues presented." Id. at 19, 97 S.Ct. at 32. Appellate permission was considered unnecessary because a district court would be capable of recognizing a frivolous 60(b) motion and because a district court ruling premised upon events occurring subsequent to an appellate court decision would not flout an appellate mandate.

While *Standard Oil* dealt with a change in circumstances arising from the alleged misconduct of a government counsel and material witness, the doctrine has since been applied to motions based upon a change in decisional law rendered subsequent to an appellate decision. *LSLJ Partnership v. Frito–Lay, Inc.*, 920 F.2d 476 (7th Cir.1990) (*en banc*). An essentially identical fact pattern is presented in this case. Here plaintiff with meritorious

grounds for relief pursuant to Rule 60(b) directed her motion in the first instance to the appeals court. Following the Supreme Court's ruling in *Standard Oil*, it was appropriate for the Second ·Circuit to deny plaintiff's motion so that the motion could be determined in the first instance here; I infer, after reviewing the history of this action, that this was the reason for the Second Circuit's denial of plaintiff's motion to recall the Court's mandate.

Since I infer that the Second Circuit denied plaintiff's motion to recall its mandate on the basis that the motion should have been initially determined by the district court, granting plaintiff's motion does not flout the Second Circuit's mandate, or the law of the case as established by the Court of Appeals.

Even if, however, the contrary were to be determined to be the case, as mentioned in part I above, *United States v. Fernandez*, 506 F.2d 1200 (2d Cir.1974), decided prior to *Standard Oil*, indicates that the appellate court may reverse the district court action on grounds of violation of the earlier mandate, but then achieve the same result as that reached in *Standard Oil*, albeit by a more circuitous route, by remanding with instructions to act in accordance with the changed conditions involved rather than the earlier mandate.

## XI

Defendant has renewed its claim, which I rejected in my earlier findings, that plaintiff's suit is barred by laches. The Court of Appeals in its 1987 decision, 836 F.2d at 112 & n. 7, referred to the possibility of laches in this case.

I have reconsidered the question and conclude that my original findings in the April 20 Order should be amplified to reflect the importance of the presence in the case of a nonbankrupt third party defendant, permitting defendant to pursue responsibility for lack of care in purchasing and reselling the art up the chain of possession. Thus plaintiff's delay does not put the innocent purchaser in the position of facing loss of the asset without recourse, whereas a ruling for defendant would leave plaintiff, as the

theft victim, with no recourse at all. The balancing of the equities, with due consideration to the difficulty of an owner who lacks institutional resources to trace stolen art, favors rejection of the laches claim here.

A claim may be barred by the defense of laches where a plaintiff unreasonably delays commencing an action and that delay operates to the prejudice of a defendant. *In Re Estate of Barbash*, 31 N.Y.2d 76, 334 N.Y.S.2d 890, 894–895, 286 N.E.2d 268, 271–272 (1972); see also *Southside Fair Housing Com. v. City of New York*, 928 F.2d 1336, 1354 (2d Cir. 1991). In reviewing a laches defense, a court must balance the two factors of delay and prejudice, and then apply that balancing test to the facts of the case. *Stone v. Williams*, 873 F.2d 620, 623–625 (2d Cir. 1989) ("*Stone I*"), rev'd on other grounds 891 F.2d 401 (2d Cir.1989) cert. denied 496 U.S. 937, 110 S.Ct. 3215, 110 L.Ed.2d 662 (1990) ("*Stone II*"). Because of the particularly fact sensitive nature of the laches inquiry and the lack of any objective standard pursuant to which a laches defense will be held to bar an otherwise valid claim, an assessment of whether a plaintiff is guilty of laches is committed to the sound discretion of the trial court. See *Stone I*, 873 F.2d at 623–624.

In assessing delay, the focus is on the reasonableness of a plaintiff's delay rather than on its length. Where a plaintiff delays in bringing suit because she is "justifiably ignorant of the facts giving rise to the cause of action," a laches defense will not operate. *In Re Estate of Barbash*, 334 N.Y.S.2d at 895, 286 N.E.2d at 271; see also *Stone I*, 873 F.2d at 624–625.

It is also important to recognize that "[l]ack of diligence, standing alone, is insufficient to support a claim of laches; the party asserting the claim also must establish that it was prejudiced by the delay." *Majorica, S.A. v. R.H. Macy & Co. Inc.*, 762 F.2d 7, 8 (2d Cir.1985); *Augustine v. Szwed*, 77 A.D.2d 298, 432 N.Y.S.2d 962, 965 (App.Div. 4th Dept 1980). The prejudice which will support a laches defense may take several forms. The passage of time may make it more difficult for a defendant to defend against a claim by virtue of the death of witnesses, lost evidence or faded memories, or a defendant may have changed position in reliance upon the absence of a suit. *Stone I*, 873 F.2d at 625; *Augustine*, 432 N.Y.S.2d at 965–966. Courts should also consider the underlying value of repose when reviewing a laches argument and reject a laches defense where a defendant has engaged in egregious conduct which would obviate any prejudice the defendant might have suffered. *Stone I* at 626; *Stone II*, 891 F.2d at 404; *Augustine* at 966.

In the April 20 Order, I explicitly held that Mrs. DeWeerth had not unreasonably delayed in prosecuting her claims for purposes of determining the running of the statute of limitations. As noted *supra*, the Court of Appeals for the Second Circuit, acting prior to *Guggenheim*, reached the opposite conclusion. The Court of Appeals reviewed my findings on this issue on a *de novo* basis, holding that such review is appropriate where an appellate court considers the application of a legal standard by a district court to a set of facts (in this case, the "due diligence" requirement announced in *DeWeerth*. 836 F.2d at 110). In contrast, "[a] ruling on the applicability of laches is overturned only when it can be said to constitute an abuse of discretion." *Stone I*, 873 F.2d at 624 (citations omitted).

More significantly, however, I found in the April 20 Order that even if plaintiff had unreasonably delayed in asserting a claim, defendant suffered no prejudice as a result. The evidence before me demonstrated that Mrs. DeWeerth had inherited the Monet from her father and subsequently neither sold it nor conveyed it to anyone else. Moreover, after analyzing the specific arguments made by the defendant with respect to the prejudice allegedly caused by plaintiff's delay, in particular the prejudice defendant allegedly suffered by virtue of the death of Mrs. DeWeerth's sister, I held that these arguments were without merit:

Even if plaintiff had unreasonably delayed her demand, defendant cannot show that she was prejudiced by the delay. She has argued that because of the delay the testimony of Frau von Palm, the only person who could testify as to what happened to the painting, has been irretrievably lost. This argument fails because it assumes, contrary to all the other evidence presented, that Frau von Palm's testimony would have been favorable to her.

It also fails because it is simply not true. Defendant could have deposed Reichenbach to attempt to trace the history of the painting's transfers, but she did not. Having failed to exhaust obvious paths of inquiry she cannot sustain her burden of proving that she was prejudiced. April 20 Order at 695, n. 10.

It may be that the Second Circuit believed this determination was clearly erroneous. Given the fact that it never explicitly reached the laches issue, however, either in its December 30 Order or in its denial of plaintiff's motion for the recall of its mandate, I do not assume that the Second Circuit reached such a conclusion.[12]

To the extent that my April 20 Order did not clearly address the laches issue, I believe it would be appropriate to clarify that Order here: plaintiff, in prosecuting this action, was not guilty of laches. Plaintiff did not unreasonably delay in prosecuting her claims. And even assuming plaintiff did fail to exercise due diligence in searching for her stolen painting, defendant suffered no prejudice as a result.

Defendant, of course, has possessed the Monet for many years—constituting an advantage of value since monies would have had to be paid to rent the painting for that period, but also doubtless exacerbating the pain which will be incident to loss of the art object. Like plaintiff, defendant has, of course, been victimized by an unknown wrongdoer or wrongdoers—the original thief and those who passed on the painting with knowledge or suspicion of its theft or lack of due care in buying and selling it. But defendant also has recourse at least one step backward up the chain of custody.

The value of repose inherent in the laches defense would certainly be furthered by denying plaintiff's motion. But the fact that a long time has passed since defendant purchased the painting in and of itself does not mean that plaintiff is barred by laches. New York's political and judicial systems have made and reaffirmed a considered choice in cases where the rights of original owners and subsequent innocent purchasers collide. Inherent in that choice, as in any choice which might be imagined on the issue, is that one of two innocent victims will be harmed, sometimes at a point when she may legitimately feel that the passage of time has long since made her right to possession inviolate. As has been restated innumerable times, however, it is not the province of the federal judiciary to second guess the manner in which New York has resolved this dilemma; neither can New York's policy be obviated by the utilization of an equitable doctrine imbued with sufficient flexibility to achieve a preferred result.[13]

## XII

Since I find that plaintiff has asserted valid grounds for relief pursuant to Federal Rule of Civil Procedure 60(b)(6) and that this court has the authority to grant it, the

---

**12.** Apart from laches, the Court of Appeals in *DeWeerth* referred to evidentiary issues which it did not discuss. I conclude that the Court did not find them potentially dispositive. Otherwise it would presumably have ruled based upon them rather than adopting a state law interpretation not clearly foreshadowed by prior state rulings, thus implicating the constitutional dimensions of *Erie.*

**13.** This is not to suggest, of course, that the defense of laches may not be utilized under appropriate circumstances to bar a claim for the recovery of a stolen chattel. Indeed the New York Court of Appeals in *Guggenheim* explicitly held that a claim timely commenced under New York's demand and refusal law might be barred by the laches doctrine and that in assessing such a laches argument, a plaintiff's lack of diligence in pursuing a claim would be relevant. *Guggenheim,* 567 N.Y.S.2d at 628, 569 N.E.2d at 431. I merely hold that under the particular facts of this case, the defense of laches here does not bar plaintiff's claim.

Memorandum Order of April 20, 1987 is readopted as amplified herein. Plaintiff is directed to submit a proposed judgment.

SO ORDERED.